**Walter HIMMLER, Executor of the Estate of Anna Himmler, Carl Fidorra, individually and on behalf of all other parties similarly situated, Plaintiffs-Appellees,**

v.

**Joseph CALIFANO, Secretary of HEW, and Michigan Hospital Service, Defendants-Appellants.**

No. 77–1083.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 9, 1979.

Decided Dec. 11, 1979.

James K. Robinson, U. S. Atty., Detroit, Mich., William Kanter, John M. Rogers, Alfred Mollin, Attys., Civ. Div., App. Section, Dept. of Justice, Washington, D. C., for defendants-appellants.

Alan W. Houseman, Michigan Legal Services, Inc., Kenneth Lee Lewis, Detroit, Mich., for plaintiffs-appellees.

Before EDWARDS, Chief Judge, and LIVELY and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

In this appeal we are called upon to decide whether the Social Security Act and the Due Process Clause of the Fifth Amendment require the Secretary of Health, Education and Welfare to provide notice and an opportunity for a hearing before medical expenses already incurred by eligible Medicare recipients can be initially rejected by a fiscal intermediary for Medicare payment as not "medically necessary" when such services were previously certified as necessary by the beneficiary's physician and by a utilization review committee. We hold that the regulatory

scheme at issue complies with the Social Security Act and that it does not deprive the plaintiffs of due process. Accordingly, we reverse the district court's judgment, 422 F.Supp. 196, holding to the contrary.

## I. THE PARTIES

This suit was originally brought in the district court by and on behalf of two Medicare beneficiaries, Anna Himmler and Carl Fidorra, for payment of health care services rendered to them. Both of these plaintiffs were receiving skilled medical care, certified as medically necessary by their doctors and by a utilization review committee. Anna Himmler was still receiving skilled nursing services when she was first informed by Michigan Blue Cross, the fiscal intermediary, that a period of approximately two months during which she had received nursing home care would not be covered by Medicare. Carl Fidorra received a notice subsequent to his discharge from the hospital that a portion of his hospital care would not be covered by Medicare. Each individual was informed of his or her right to a hearing if requested within six months. No such request was made by either, and instead this action was commenced.

### A. Class Action

The district court certified the action as a class action and defined plaintiffs' class as

all persons in Michigan sixty-five years of age or older who are eligible for medicare and having received inpatient hospital care, have been recommended by the attending physician or [sic: and] the utilization review committee within the hospital for further inpatient care or for transfer to an extended care facility for continued care and treatment, or to a home health care situation, and whose eligibility for such continued services under the medicare program has been, is being, or may be, under 20 C.F.R. 405.702 et. [sic] [currently 42 C.F.R.], terminated by Michigan Blue Cross without notice or an opportunity for a prior hearing.

## II. THE REGULATORY AND STATUTORY SCHEME

Part A of Title XVIII of the Social Security Act (Medicare), 42 U.S.C. §§ 1395c–1395i–2 (1976) provides insurance for eligible persons to cover the costs of hospital and hospital-related services. Generally, Part A provides for payments from the hospital insurance trust established by the Act for (1) inpatient hospital services for up to 150 days; (2) post-hospital extended care services for up to 100 days; and (3) post-hospital home health benefits for up to 100 visits. 42 U.S.C. § 1395d. Coverage does not extend to post-hospital extended care services where the care is merely custodial rather than skilled. As noted by the district judge:

The type of care needed by a patient, custodial or skilled, is a question of fact to be determined in every case. Under the statute, however, receipt of Medicare benefits for extended care services is conditioned upon certification and periodic recertification by the patient's doctor that skilled care is medically necessary. 42 U.S.C. § 1395f–(a)(2).

The patient's physician is required to certify that the patient is, in fact, ill enough to need the services of a hospital or extended care facility, and that the care needed will be that skilled type of medical care expected to be found in the institution. This determination by the patient's physician must be made at the earliest stage in which the individual patient enters the Medicare process.

Furthermore, the extended care facility providing care to the patient must have a Utilization Review Committee, composed of at least two physicians, which also periodically reviews whether the individual patient continues to need skilled nursing care, 42 U.S.C. § 1395j(8) [sic: § 1395x(j)(8)], and makes certain that the provider utilizes its facilities correctly. 42 U.S.C. § 1395x(k)(2).

Under the mandate of 42 U.S.C. § 1395x(k), utilization reviews encompass both the practices of the hospital or skilled nursing facility and the need for the partic-

ular services being furnished to individuals covered by the Act. Each utilization review plan must provide "for prompt notification to the institution, the individual, and his attending physician of any finding, (made after opportunity for consultation to such attending physician) by the physician members of such committee or group that any further stay in the institution is not medically necessary." 42 U.S.C. § 1395x(k)(4). 42 U.S.C. § 1395f(a) provides that payment may be made to providers of services for the services furnished to an individual only if:

> (7) with respect to inpatient hospital services or post-hospital extended care services furnished such individual during a continuous period, a finding has not been made (by the physician members of the committee or group, as described in section 1395x(k)(4) of this title, . . .) pursuant to the system of utilization review that further inpatient hospital services or further post-hospital extended care services, as the case may be, are not medically necessary; except that, if such a finding has been made, payment may be made for such services furnished before the 4th day after the day on which the hospital or skilled nursing facility, as the case may be, received notice of such finding.

Thus, no provider will be eligible to receive Medicare payment for services rendered four days or more after the utilization review committee certifies that further services are not medically necessary.

Under the statutory scheme and the regulations in effect at the time of this litigation, the physician's certification and the decision of the utilization review committee of a given provider *initially* determine the patient's right to Medicare coverage for the services provided, but the *final* determination of an individual's entitlement to benefits and the amount of any such benefits is entrusted to the Secretary of HEW, in accordance with the regulations which he prescribes. 42 U.S.C. § 1395ff(a). Under the Act, the Secretary's oversight of the administration of the Medicare program is delegated to a "fiscal intermediary." The Sec-

retary has authority to contract with private agencies, such as Michigan Blue Cross, who are thereupon empowered to act on his behalf in performing certain functions. 42 U.S.C. § 1395h(a) provides:

> Such agreement may also include provision for the agency or organization to do all or any part of the following: (1) to provide consultative services to institutions or agencies to enable them to establish and maintain fiscal records necessary for purposes of this part and otherwise to qualify as hospitals, extended care facilities, or home health agencies, and (2) with respect to the providers of services which are to receive payments through it (A) to serve as a center for, and communicate to providers, any information or instructions furnished to it by the Secretary, and serve as a channel of communication from providers to the Secretary; (B) to make such audits of the records of providers as may be necessary to insure that proper payments are made under this part; and (C) to perform such other functions as are necessary to carry out this subsection.

This fiscal intermediary is thus the alterego of the Secretary for the day-to-day administration of the Medicare program. As explained in *Martinez v. Richardson*, 472 F.2d 1121, 1123 (10th Cir. 1973): "This intermediary [Blue Cross] determines the amount due to the provider and makes payment accordingly. It thus acts as a field service for the Secretary." While normally such decisions by the fiscal intermediary are final, an individual who is dissatisfied with the determination is entitled (subject to certain dollar limitations) to a hearing under the procedures established by 42 U.S.C. § 405(b), and to a judicial review of the Secretary's final decision as provided by 42 U.S.C. § 405(g). 42 U.S.C. § 1395ff(b).

The parties are agreed that the ultimate determination of entitlement rests with the Secretary under the Act. The parties disagree, however, concerning the significance to be attached to the initial favorable determinations made by the physician and the

utilization review committee.[1] Specifically the parties are at odds over the procedures which the Act and the Fifth Amendment mandate when an initial judgment in favor of coverage is made by the utilization review committee and the claimant's physician and subsequently is overturned by the Secretary through the fiscal intermediary.

## III. THE DISTRICT COURT DECISION

We admit to considerable uncertainty concerning the effect and intent of the decision of the district court in this case and, indeed, with the position of the plaintiffs in this appeal.

The operative portion of the summary judgment appears to grant to the plaintiffs and their class a hearing on the merits of the decision to deny payment for medical treatment which was approved by the physicians and utilization review committees. The irony of this portion of the judgment is that the Secretary appears always to have recognized the right of the plaintiffs to this very relief and would have accorded such a hearing on the merits had the plaintiffs elected to pursue their administrative remedies rather than to institute the district court action. The right to a hearing provided in the judgment · of the district court merely reaffirms those rights which already exist under the statute. See 42 U.S.C. § 1395ff(b). The Secretary has never argued that such rights are unavailable to dissatisfied beneficiaries.

In granting summary judgment in favor of the plaintiffs on the merits of the suit, the district court conceived that the plaintiffs had raised two issues in their lawsuit: (1) whether or not a physician's certification and an assessment of a utilization review committee of a skilled nursing facility as to medical necessity of certain treatment is conclusive and establishes, at least preliminarily, plaintiffs' entitlement to payment for treatment received; and (2) whether or not a right to a hearing prior to an administrative determination

denying coverage for skilled nursing facility services and commensurate reimbursability is constitutionally required.

After summarizing the statutory scheme, the district court commented on the roles of the physician and the utilization review committee as they bear on entitlement. The district judge concluded that the real issue was not who had the ultimate authority to decide the question of entitlement, but rather, when the entitlement vested. Citing pertinent portions of 42 U.S.C. § 1395f(a) (the provision entitled "Conditions of and limitations on payment for services—Requirement of requests and certifications"), he held that the individual had met all of the conditions imposed by that Section when his or her physician and the review committee had certified that the services he received were medically necessary. The district judge therefore concluded that there was a "vesting" after the physician and utilization review committee had certified that services were medically necessary, and that a "pretermination hearing" was required before the Secretary could deny coverage for those services. The court stressed the reliance of the patient on these certifications in determining whether to proceed with treatment, and the unfairness of informing a patient only after the rendering of treatment that such treatment would not be covered by Medicare.

The court based its holding that a "pretermination hearing" was necessary both on the Social Security Act and on the Due Process Clause. The court ruled that the "reasonable notice and opportunity for a hearing" which must be accorded to a dissatisfied beneficiary under 42 U.S.C. § 405(b) was not provided in this case since "notice that the benefits would not be [paid] by Medicare came after the treatment had been given." In other words, post-treatment notice that Medicare payment would not be made was "unreasonable" in the view of the trial court.

---

1. The status of plaintiffs' class as certified precludes any claim relating to any due process rights where the patient has *not* been recommended by his physician and the utilization review committee for further extended care treatment.

The court also found a source of authority in the Fifth Amendment, analogizing the Medicare beneficiaries in this case to the welfare recipient whose right to a pretermination hearing was recognized by the Supreme Court in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The district court rejected the suggestion of the Secretary that the beneficiary of disability payments in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), provided a more suitable analogy to the situation of Medicare beneficiaries:

In this case, the plaintiffs are over sixty-five years old and have only a small monthly income. Even a combination of plaintiffs' monthly income and government assistance could put them in rather dire straits should they be required to pay some substantial and unanticipated medical bills. For this reason, plaintiffs' case is more like the case in *Goldberg* than in *Eldridge*. Thus, as in *Goldberg*, a pretermination hearing is constitutionally required and must be provided to these plaintiffs by the Secretary before the decision is made not to pay for medical services that have already been provided and certified as medically necessary.

The prospective effect of the district court's decision is difficult to determine, since HEW does provide a full evidentiary hearing on the merits preceded by notice and followed by review procedures in every case before the Medicare coverage decision becomes final. To this extent, the trial judge merely accorded the plaintiffs a right they already possessed. The district court's opinion does not suggest that the plaintiffs must be excused from their obligations to pay for services if, upon a final review, it is found that they are not entitled to Medicare coverage for those services. Notwithstanding the "vesting" analysis employed, the court appeared to acknowledge that the ultimate authority to determine entitlement rests with the Secretary.

In his brief on appeal, the Secretary suggests two possible constructions of the district court's decision:

[T]he court could have ordered simply that any determination of a provider doctor or utilization review committee that services are required would be binding on HEW. This would be directly contrary to the Act, § 1395ff(a). The district court appeared expressly to refrain from reaching this conclusion. . . .

. . . [I]nstead, the judgment and the final paragraph of the court's opinion indicates that the court was merely ordering that Medicare beneficiaries, for whom provider doctors or utilization review committees have certified that services are medically necessary, are entitled to a hearing and judicial review prior to their having to pay the bill. . . . That this is what the court is requiring is supported by the fact that the court relied on Supreme Court precedents regarding the right to a hearing prior to a termination of continuing benefits. . .

. . . [T]he court's order may also be interpreted to require that the Secretary adjudicate a claim for payment before conclusion of the prescribed medical services, and that such adjudication must be in the form of a hearing. The court's order may be so interpreted only by reference to the part of [the] court's opinion which indicates that the statutory requirement of "reasonable notice" of the opportunity for a hearing cannot be notice which "came after the treatment had been given."

In short, the court has either ordered hearings prior to *payment*, although such hearings are already provided, or ordered burdensome hearings prior to *treatment* in all future cases, contrary to the Act and unnecessary to meet the concern of plaintiffs and the court.

For their part, plaintiffs assert that both of the Secretary's interpretations of the district court's decision are erroneous. The plaintiffs specifically reject the Secretary's suggestion that the district court ordered a pre-treatment hearing. The plaintiffs state: "Nor did the district court—as the appellants contend—order the Secretary to

provide a hearing prior to the rendering of medical services. The hearing required is one that is prior to the termination or reduction of benefits." Although plaintiffs thereby disclaim any desire to be awarded a pre-treatment hearing, the concerns they raise and which were accepted by the district court can be fully met only by a hearing prior to the time when the patient decides to accept or reject recommended treatment.

The following passage from the plaintiffs' brief illustrates these concerns:

Patients who enter extended care facilities do so in reliance on coverage under the Act. . . . It is clear that a person, recently hospitalized is going to accept the treatment recommended by her physician and, usually without knowing, face the possibility of staggering medical bills upon the rejection of her claim. . . . The review [of the fiscal intermediary] occurs long after the fact and at a time when the beneficiary cannot possibl[y] make a decision whether he or she wants to run the risk of incurring an unanticipated and usually costly expense.

These arguments are echoed in the opinion of the district court:

On this basis [the physician's and review committee's certifications], the plaintiffs chose to go ahead with the treatment recommended—the time to inform the plaintiffs their claims could be denied by the Secretary was not months after their treatment had ceased. . . . [N]o reasonable notice was given by the Secretary because notice that the benefits would not be pa[id] by Medicare came after the treatment had been given.

It is apparent that these concerns, expressed both by the district court and by the plaintiffs, could only be met by a hearing prior to the liability being incurred; in other words, a hearing before services are rendered. Nevertheless the plaintiffs disclaim that this is what they seek.

## IV. THE RELIEF SOUGHT BY THE PLAINTIFFS

Since the plaintiffs apparently do not demand that the Secretary provide notice and a hearing before the services which have been certified as medically necessary are rendered, and since they do not assert that the medical judgment by the physician and the utilization review committee may not be reviewed by the Secretary or the fiscal intermediary, we can only conclude that the plaintiffs' concern must focus on the timing of the Secretary's post-treatment decision. There is at least a suggestion by the plaintiffs in their briefs and by the district court in its opinion that a delay in the decision of the fiscal intermediary to deny coverage, or the decision itself, may adversely affect the future delivery of medical services to the patient, and that the failure to afford the patient a prompt opportunity to establish his or her entitlement will, as a practical matter, result in a "termination." This suggests that the interest to be protected is the claimant's right to a continuing flow of services which may be interrupted by adverse administrative action.

Plaintiffs argue that:

Entitlement vests upon proper medical certification. What is at stake is a continuing benefit—namely the continuation of skilled nursing services provided through Medicare reimbursement. These benefits continue and must be paid, until such time as the medical facts upon which the decision was made have been demonstrated to be incorrect. Under the due process clause such a determination cannot be made until notice and an opportunity for a hearing are provided. Thus, there are benefits in issue, they are continuing benefits and they are subject to protection.

The fact remains, however, that if the benefits are to be continued so that the patient continues to receive skilled nursing services during the entire administrative review process until a final decision on the propriety of those very services is ultimately rendered, someone must pay for those services. If Medicare must pay for those services even if they are finally determined to have indeed been unnecessary, the Secretary

would effectively be deprived of any final right to determine eligibility. If alternatively the patient must bear the burden of payment, all of the undesirable effects of the patient's detrimental reliance upon Medicare entitlement rise to haunt him and the harm to him is now compounded by the inevitable delay.

Furthermore, we note that plaintiffs have not presented any facts which suggest that they have been denied essential services by the action of the Secretary in initially refusing entitlement. The record is devoid of any suggestion that the fiscal intermediary's adverse determination caused the claimants to be ineligible for any further benefits under the Medicare program.

The plaintiffs are left then with their central complaint: that, under the Secretary's procedures, Medicare patients who proceed with treatment in reliance upon certifications by their physicians and utilization review committees that such services are medically necessary may be faced, after the fact, with personal liability for substantial and unanticipated medical bills when those bills may not have been incurred had the patient realized in advance that they would not be covered by Medicare. Further, Medicare patients may be held personally liable for payment to the provider of those services before a final hearing has taken place. As will be discussed *infra*, Congress has already sought to remedy or at least alleviate these problems by recent amendments to the Social Security Act.

The question which remains for us is whether the statutory and regulatory scheme which existed before the effective date of those amendments should be stricken down as violative of the Act itself and of the Due Process Clause. We hold that it may not.

## V. COMPLIANCE WITH THE SOCIAL SECURITY ACT

■ The regulatory scheme complained of does, in fact, provide the claimants with notice and an opportunity to be heard before a final determination of whether the services rendered are to be covered by Medicare. In this respect, the requirements of the Social Security Act, in our opinion, are met. We do not read the language of Section 405b or Section 1395ff as requiring any hearing contemporaneous with the administration of services other than the rudimentary opportunity to be heard pursuant to a utilization review committee review, as mandated by 42 U.S.C. § 1395f(a)(7).

Under Section 1395x(k)(4), the utilization review committee is to consult with the attending physician before making any finding that a further stay in the institution is not medically necessary. That section also requires that the institution, individual and attending physician shall be given prompt notification of any such adverse finding. Section 1395f(a)(7) further provides that if there is a finding that extended care services are not medically necessary, a payment may be made for those services up to the fourth day after the day on which the hospital or skilled nursing facility received notice of such finding. Therefore, while not ascribing finality to the decision of the utilization review committee, the regulations and statute, by protecting the coverage of the patient for at least four days after the decision has been made and by providing for a consultation between the attending physician and the committee in case of such decision, provide for at least a limited protection from the the risk that a patient will be forced either to leave the extended care facility or to assume personal financial responsibility for continued treatment there at that time.

The issue, therefore, is whether more is required by the Due Process Clause.

## VI. THE DUE PROCESS CLAUSE

■ In *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court established that welfare recipients who had been determined to be eligible for welfare benefits had a right under the Due Process Clause to an evidentiary hearing at which oral testimony could be given prior to any termination of those benefits. The crux of the Supreme Court's determination in *Goldberg v. Kelly* was that:

[T]ermination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy.

*Id.* at 264, 90 S.Ct. at 1018, 1019.

Both the plaintiffs and the district court analogize the plight of Medicare beneficiaries to that of the welfare recipients in *Goldberg v. Kelly.* The instant case is indeed comparable to *Goldberg v. Kelly* insofar as a Medicare recipient may be held to be liable for medical services already received, or be denied a continuation of medical services, before he has been afforded a full hearing. An individual who has been initially denied Medicare payments by the decision of a fiscal intermediary such as Michigan Blue Cross could conceivably be forced to pay for the medical services received before he has been afforded a hearing.[2] Similarly, it is possible that a provider would refuse to continue furnishing medical services to a patient if an initial determination by the fiscal intermediary indicates that government reimbursement for the services provided is unlikely.

It is important to recognize, however, that the due process analysis in *Goldberg v. Kelly* is not relevant to an individual's ultimate duty to pay for benefits received *after* he has had a hearing and has been determined to be *ineligible* for government aid. In *Goldberg v. Kelly,* Justice Brennan tacitly recognized that the government could attempt to recover welfare benefits which

were paid to an individual who was later determined, after a hearing, to have been ineligible for those benefits.[3] The concern in *Goldberg v. Kelly* was that *eligible* persons would be denied aid before it was finally determined that they were in fact eligible, not that ineligible individuals would have to pay for benefits erroneously received. Therefore, the reasoning of *Goldberg v. Kelly* is not relevant to the plight of Medicare recipients who are forced to pay for medical services after they have been afforded a hearing at which it was determined that the services they received were not covered by Medicare. The parallels between the welfare recipients in *Goldberg v. Kelly* and the Medicare beneficiaries here are therefore quite limited. It is only the effect which may be wrought by the initial fiscal intermediary decision *before* a hearing has been afforded that can be compared to the deprivation considered in *Goldberg v. Kelly.*

A further consideration is whether Medicare beneficiaries are in any way deprived of a continuing benefit, like the welfare payments in *Goldberg v. Kelly,* by virtue of the fiscal intermediary's decision. The Medicare program gives eligible individuals the benefit of *payment* for medical services already rendered; it does not directly provide any entitlement to the medical services themselves. 42 U.S.C. § 1395d(a) provides that "[t]he benefits provided to an individual by the insurance program under this part shall consist of entitlement to have payment made on his behalf . . . ." Because the medical services will necessarily have been received by the individual before the fiscal intermediary makes the initial determination whether it will pay the bill

---

**2.** Although the Secretary has argued that providers do not in practice pursue their claims against individual patients before a final decision on eligibility has been rendered by the Secretary, we have been referred to no statutory or regulatory provision which would prevent such action. Because the administrative review process can be quite time consuming, it certainly is not inconceivable that a provider would seek payment from the individual patient based on his contract with the provider before eligibility is finally determined.

**3.** Justice Brennan acknowledged the state's argument that welfare payments which were erroneously made would be very difficult to recoup, stating: "the benefits paid to ineligible recipients pending decision at the hearing probably cannot be recouped, since these recipients are likely to be judgment-proof." *Goldberg v. Kelly,* 397 U.S. 254, 266, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287 (1970). The Court nowhere indicated that such collection procedures would be improper, but only that they were likely to prove fruitless.

for those services, its decision does not cause the kind of interruption of a continuing benefit which was at issue in *Goldberg v. Kelly.* The decision by the fiscal intermediary will in most instances work no deprivation at all, as the medical services will have already been received and the final determination of ultimate liability for payment for those services will be made only after the opportunity for a full hearing is afforded.

There are, however, two situations where a "deprivation" may be effected by the fiscal intermediary's decision and not completely cured by the final administrative hearing. First, the plaintiffs suggest that an ongoing dispute over Medicare payment will jeopardize the patient's chances of receiving continued medical services for the same condition, as well as his receipt of different medical services which may subsequently be required. The plaintiffs have advanced no evidence that services necessitated by a new or different medical condition will be withheld because of an unrelated Medicare dispute. However, it is quite possible that the continuation of the kind of services (e. g., nursing home care) which are the subject of the disputed medical bill may be jeopardized by an initial adverse decision if the patient does not appear to be financially able to pay for such services himself. If ongoing services are terminated before the final hearing is afforded, and the hearing ultimately shows that the services were in fact medically necessary and thus eligible for Medicare payment, the fiscal intermediary's decision will indeed have worked what amounts to a deprivation of a continuing benefit. The second possible deprivation would occur if a patient is personally required to pay the provider for the services he received before it is finally determined whether the services are covered by Medicare. These deprivations are only temporary in nature, and a final decision by the Secretary in favor of the recipient will in all events cure them.

Although the named plaintiffs have suffered neither of these theoretical deprivations, and the class is not limited to those who have, we will examine the due process claim raised in light of the possibility that such deprivations may occur in at least some circumstances. Again, however, the decision of the fiscal intermediary in most situations raises no due process question at all, as it works no deprivation.

Although the two possible deprivations effected by the fiscal intermediary's decision make *Goldberg v. Kelly* initially relevant to this case, there remains a crucial difference between the Medicare payments at issue here and the welfare payments with which the Court in *Goldberg v. Kelly* was concerned. Eligibility for Medicare coverage is not conditioned upon financial need. This has historically represented a substantial difference in concept between welfare benefits, keyed directly to need, and benefits under the Social Security Act. By creating from earnings during the productive period of life a secure base for income and care following retirement or total disability, the Social Security Act has been designed to avoid the stigma of the public dole.

This classic distinction was recognized in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). There the Supreme Court, speaking through Mr. Justice Powell, declined to extend the logic of *Goldberg v. Kelly* to require a due process hearing prior to termination of Social Security disability payments. There, as here, the Secretary had not contended that procedural due process was inapplicable to termination of benefits and, again as here, the dispute centered upon "what process is due prior to the initial termination of benefits, pending review." *Mathews v. Eldridge, supra,* 424 U.S. at 333, 96 S.Ct. at 902.

The situation of the plaintiffs here more closely resembles that of the disability insurance beneficiaries in *Mathews v. Eldridge* than it does that of the welfare recipients in *Goldberg v. Kelly.* Measuring the important interests at stake, as described both in *Goldberg v. Kelly* and in *Mathews v. Eldridge,* we do not conceive that the medicare recipient's interest in finality of the decision as to whether he is eligible for

benefits at the earliest possible stage outweighs the state's interest in assuring a fiscally responsible system which is subject to proper auditing.

It is not argued here that the administrative hearing which is available after a denial of coverage by the fiscal intermediary is procedurally deficient. The argument is simply that this hearing comes too late. Although here, as in *Mathews v. Eldridge*, the delay may cause hardship in some cases, it is of practical necessity. As the Supreme Court wrote in *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and reiterated in *Mathews v. Eldridge, supra*, 424 U.S. at 335, 96 S.Ct. at 902: "due process is flexible and calls for such procedural protections as the particular situation demands." The Court in *Mathews v. Eldridge* elaborated on this theme, writing: "[a]n additional factor to be considered . . . is the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards. Central to the evaluation of any administrative process ·is the nature of the relevant inquiry." *Mathews v. Eldridge, supra*, 424 U.S. at 343, 96 S.Ct. at 907.

Hearings providing the full panoply of procedural rights which must precede any "final" determination are necessarily time consuming. If these hearings must be provided before a patient's receipt of medical services, the patient may suffer from the delay. Furthermore, a patient in need of medical care arguably should not be required to participate in an adversary proceeding. Thus, any requirement that final hearings be conducted before "covered" medical services can be administered would result in hardship to the patients themselves.

The potential deprivation here, as in *Mathews v. Eldridge*, is only temporary, for full payment for medical services rendered will be made if the services are finally determined to be covered by Medicare. A further similarity to *Mathews v. Eldridge* is that the information upon which the fiscal intermediary's decision is based is of a medical nature. This type of medical evaluation does not normally require the type of input from the patient which the welfare eligibility decision requires from the welfare recipient. Furthermore, the decision whether to undergo medical treatment is one ordinarily made by the patient, not the government. We see no reason why an individual should exercise a lesser degree of care in making this decision where the treatment is paid for by the government than he otherwise would. There is obviously a strong policy interest in procedures which guard the system from abuse.

For all of these reasons we conclude that the Social Security Act and the regulations promulgated thereunder are consistent with the due process requirement imposed by the Fifth Amendment.

## VII. JURISDICTION

■ The Secretary argues here, as he did in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), that the provisions of 42 U.S.C. § 405(h)[4] foreclose the exercise of the jurisdiction to review final decisions granted by Section 405(g). That argument is, we think, fully answered in *Mathews v. Eldridge, supra*.

Section 405(h) expressly forecloses the exercise of jurisdiction on two of the bases asserted by the plaintiffs' complaint, general federal subject matter jurisdiction under 28 U.S.C. § 1331, and· jurisdiction under 28 U.S.C. § 1346, dealing generally with civil suits against the United States. 42 U.S.C. § 405(h) provides:

(h) Finality of Secretary's decision

The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under sections 1331 or 1346 of

---

4. Incorporated with respect to Medicare claims by 42 U.S.C. § 1395ii.

title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(g) provides that:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . . Such action shall be brought in the district court of the United States . . . .

Since admittedly neither party here pursued the administrative remedy available under the Act to conclusion, there is no "final decision" within the meaning of Section 405(g). In *Weinberger v. Salfi*, Section 405(g) was interpreted to specify three normal requirements for judicial review of a decision of the Secretary: (1) A final decision of the Secretary made after a hearing; (2) Commencement of a civil action within sixty days after the mailing of notice of such decision . . . ; and (3) Filing of the action in the appropriate district court.

The Court in *Salfi* found that of the three requirements, only the first was jurisdictional in the usual sense of conferring subject matter jurisdiction upon the court. Although the Court in *Salfi* held that a "final decision" of the Secretary was a jurisdictional prerequisite, this requirement was softened somewhat by the Court's subsequent decision in *Mathews v. Eldridge, supra*. In *Eldridge* the Court held that the jurisdictional final decision requirement itself consists of two elements, one waivable and one nonwaivable: "The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary. Absent such a claim there can be no 'decision' of any type." 424 U.S. at 328, 96 S.Ct. at 899. The *Eldridge* Court noted particularly that a failure to raise with the Secretary a constitutional claim to a pretermination hearing will not defeat

the jurisdiction of the courts. The Court observed:

It is unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context. The Secretary would not be required even to consider such a challenge.

\*    \*    \*    \*    \*    \*

. . . Moreover, there is a crucial distinction between the nature of the constitutional claim asserted here and that raised in *Salfi*. A claim to a predeprivation hearing as a matter of constitutional right rests on the proposition that full relief cannot be obtained at a postdeprivation hearing.

*Id.* at 330–31, 96 S.Ct. at 900–901.

As the district court was careful to observe, the ultimate question whether, upon the facts, the plaintiffs here were eligible for benefits, was not the real issue but rather, as in *Eldridge*, the question was whether the plaintiffs and their class had been accorded due process by the procedures which occurred prior to the termination of their benefits. As in *Eldridge*, the central issue here is "what process is due prior to the initial termination of benefits, pending review." *Mathews v. Eldridge, supra*, 424 U.S. at 333, 96 S.Ct. at 902.

We conclude that this case comes within those narrow limits in which review is permitted under *Salfi* and *Eldridge*. In *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Supreme Court observed that *Salfi* and *Eldridge* "adhered to the well-established principle that when constitutional questions are in issue, the availability of judicial review is presumed, and we will not read a statutory scheme to take the 'extraordinary' step of foreclosing jurisdiction unless Congress' intent to do so is manifested by 'clear and convincing' evidence." *Id.* 430 U.S. at 109, 97 S.Ct. at 986.[5]

---

5.  The Secretary goes even further to assert that the constitutional claim here is so insubstantial as not even to be colorable. It is sufficient

answer to note that the district court itself was sufficiently persuaded of the substantiality of the claim to rule in favor of it. While we do

### VIII. MOOTNESS

■ The Secretary also argues that the 1972 amendments to the Social Security Act fully satisfy any concerns which plaintiffs have raised regarding the dilemma presented by a patient's adverse reliance upon the advice of physicians and the utilization review committee. Since this issue is not directly addressed by the district court, the Secretary makes the argument by way of mootness, inferring that the entire litigation could be reversed and remanded to the district court for dismissal as moot in view of present applicability of the amendments.

The 1972 amendments in 42 U.S.C. § 1395pp limit the personal liability of Medicare claimants for medical bills when their claims are disallowed under Medicare. Under Section 1395pp(a), the Secretary will pay the provider for medical services furnished if neither the provider nor the patient knew or reasonably could be expected to have known that Medicare payment for the services would be denied. Where the patient did not know and could not reasonably have known that payments would not be made for medical services, but the provider knew or could be expected to have such knowledge, the Secretary will indemnify the patient. 42 U.S.C. § 1395pp(b). These provisions, however, apply only to items or services furnished after October 30, 1972. Pub.L. 92–603, Title II, § 312(b), 86 Stat. 1386 (1972).

In answer to the Secretary's argument, plaintiffs respond that the amendment does not meet the interest which they assert. They claim that while the amendment ameliorates the impact of an adverse Medicare termination for those determined to have acted upon their physician's advice without knowledge of the fact that the services in question were not covered, it does not provide the opportunity for a hearing prior to the "retroactive" decision of the fiscal intermediary. Because this issue was not raised in the district court, and the amendments were not applicable to the

services rendered to the named plaintiffs, we do not consider it appropriate to comment extensively on the validity or even the construction of the 1972 amendments. We do note, however, that even under these amendments, a Medicare recipient can be held personally liable for medical bills incurred before he is indemnified for his payments. Further, it is still possible under the new statutory scheme that an individual could have his or her medical services terminated by a provider on the basis of the initial fiscal intermediary decision denying eligibility. For these reasons we judge that the same kinds of concerns, albeit to a lesser degree, may be present under the amended statute, and therefore modification of the certified class is unnecessary.

The judgment of the district court is reversed.

not agree with the conclusion of the district court, we recognize that the issue is substantial even though it ultimately fails. *See, e. g., Hagans v. Lavine,* 415 U.S. 528, 537–43, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), and *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).