646 F.2d 74
 MONMOUTH MEDICAL CENTER, a Non-Profit Corporation of the
State of New Jersey, Individually as provider of services
under the Medicare (Title XVIII) Provisions of the Social
Security Act, 42 U.S.C. § 1395 et seq. and on Behalf of
Beneficiaries, Irene McLaughlin, Florence Colmorgen,
Isabelle Eyre, Francis Kelly, Donald Swenson, Michael
McNamara, Sue Hennessy, Andrew Kettles, Edward G. Martin,
Ellen Mason, Gladys Monahan, James Matthews, Stephen Budd,
Dora Einbinder, Grace Curtis, Florence Gaffey, Lillian Van
Nest and Jerry Shampinear
v.
Patricia Roberts HARRIS, in her capacity as Secretary of
Health, Education and Welfare.
PT. PLEASANT HOSPITAL, a Non-Profit Corporation of the State
of New Jersey, Individually as provider of services under
the Medicare (Title XVIII) Provisions of the Social Security
Act, 42 U.S.C. § 1395 et seq. and on Behalf of
Beneficiaries, Jeanette Darmstadt, Blondine Dattilo and
Bertha Litzebauer
v.
Patricia Roberts HARRIS, in her capacity as Secretary of
Health, Education and Welfare.
MONMOUTH MEDICAL CENTER, a Non-Profit Corporation of the
State of New Jersey, Individually as provider of services
under the Medicare (Title XVIII) Provisions of the Social
Security Act, and on Behalf of Beneficiaries, Eleanor Blue,
Florence Collins and Fred Slocum
v.
Patricia Roberts HARRIS, in her capacity as Secretary of
Health, Education and Welfare.
POINT PLEASANT HOSPITAL, a Non-Profit Corporation of the
State of New Jersey, Individually as provider of services
under the Medicare (Title XVIII) Provisions of the Social
Security Act, 42 U.S.C. § 1395 et seq. and on Behalf of
Beneficiary, Bronislava Skiba
v.
Patricia Roberts HARRIS, in her capacity as Secretary of
Health, Education and Welfare.
MONMOUTH MEDICAL CENTER, a Non-Profit Corporation of the
State of New Jersey, Individually as provider of services
under the Medicare (Title XVIII) Provisions of the Social
Security Act, 42 U.S.C. § 1395 et seq. and on Behalf of
Beneficiary, Mattie Bond
v.
Patricia Roberts HARRIS, in her capacity as Secretary of
Health, Education and Welfare.
Appeal of MONMOUTH MEDICAL CENTER, Point Pleasant Hospital,
Irene McLaughlin, Florence Colmorgen, Isabelle Eyre, Francis
Kelly, Donald Swenson, Michael McNamara, Sue Hennessy,
Andrew Kettles, Edward G. Martin, Ellen Mason, Gladys
Monahan, James Matthews, Stephen Budd, Dora Einbinder, Grace
Curtis, Florence Gaffey, Lillian Van Nest and Jerry
Shampinear, Mattie Bond, Eleanor Blue, Florence Collins,
Fred Slocum, Jeannette Darmstadt, Blondine Dattilo, Bertha
Litzebauer, Bronislava Skiba.
 No. 80-2138.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 24, 1981.
Decided April 1, 1981.
 
 Giordano, Halleran & Crahay, Frank R. Ciesla (argued), Middletown, N. J., for appellants; Sam Maybruch, Middletown, N. J., on the brief.
 James H. Stewart, Jr., Nauman, Smith, Shissler & Hall, Harrisburg, Pa., for Presbyterian-University Medical Center of Pennsylvania, amicus curiae.
 William W. Robertson, U. S. Atty., Newark, N. J., Anne C. Singer (argued), Asst. U. S. Atty., Newark, N. J., for appellee; Barbara Strauss, New York City, Tamar K. Klein, Brooklyn, N. Y., Asst. Regional Attys., Dept. of Health & Human Services, of counsel.
 Before ADAMS, ROSENN and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 Recently, the health care situation in New Jersey has been marked by a dearth of nursing home beds available for indigent patients.[1] As a consequence, hospitals have often been compelled to retain patients who no longer need the acute level of care that hospitals ordinarily administer, until space in an appropriate lesser-care facility can be found.[2] Monmouth Medical Center, a non-profit hospital in Long Branch, New Jersey, which participates in the federal Medicare program, sought Medicare reimbursement for several patients' hospital stays, including the time occasioned by the nursing home bed shortage. Monmouth unsuccessfully pressed its claim throughout the administrative process, and the district court upheld the denial of Medicare coverage.
 
 
 2
 In this appeal, the overriding issue is whether the Secretary of the Department of Health and Human Services (HHS) may, consistent with statutory standards, deny Medicare reimbursement to a hospital for the portion of a patient's visit that extends beyond the date that either acute-level hospital care or skilled nursing care is medically necessary, when the sole reason for the extension is the inability to obtain a nursing home bed for the patient. We agree with the district judge's conclusion that Medicare does not cover the extended stays involved in this case, and accordingly the judgment of the district court will be affirmed.
 
 I.
 
 3
 The Medicare program is a federally funded health insurance arrangement designed to reimburse health care providers for the basic costs of rendering certain limited services to patients over the age of sixty-five. 42 U.S.C. § 1395 et seq. (1976). Unlike the companion Medicaid scheme, Medicare is primarily an acute care program, and does not provide comprehensive coverage. See Gosfield, Medical Necessity in Medicare and Medicaid: The Implications of Professional Standards Review Organizations, 51 Temple L.Q. 229, 232, 250 (1978). Medicare provides merely "basic protection" against the costs of services in only three categories: (1) inpatient hospital services, 42 U.S.C. § 1395d(a); (2) post-hospital extended care services, 42 U.S.C. § 1395x(h); and (3) home health care services, 42 U.S.C. § 1395x(m). The extended care category comprises "services furnished to an inpatient of a skilled nursing facility." 42 U.S.C. § 1395x(h). Thus, Medicare does not cover intermediate-level nursing home care, or care that does not rise to the level of skilled services.
 
 
 4
 Medicaid, on the other hand, is far more exhaustive in its coverage, because it is addressed to those who cannot afford health care, while Medicare covers individuals without regard to their pecuniary condition. 42 U.S.C. § 1396 (1976). Whereas Medicare covers only three service categories, Medicaid authorizes states to fund seventeen types of health care services, specifically including care in intermediate-level nursing facilities. 42 U.S.C. § 1396d(a) (15) (1976). See generally Note, State Restrictions on Medicaid Coverage of Medically Necessary Services, 78 Colum.L.Rev. 1491 (1978).
 
 
 5
 The Medicare program reimburses only care that is "reasonable and necessary" for the treatment or diagnosis of illness or injury. 42 U.S.C. § 1395y(a)(1). To insure that only medically necessary care is funded, the statutory framework establishes a system of utilization review committees, staffed by health care professionals. The task of these committees is to evaluate the medical necessity of particular services underlying a claim for reimbursement. See generally Gosfield, supra. In addition to the exclusion from coverage of unnecessary care, Medicare also specifically precludes reimbursement for "custodial care." 42 U.S.C. § 1395y(a)(9) (1976). Although the statute does not define this term, HHS regulations indicate that custodial care in the context of the Medicare program is any care that does not meet the definition of extended or skilled care. 42 C.F.R. § 405.310(g) (1979).
 
 
 6
 Insuring fiscal responsibility, curtailing health care costs, and eliminating the over-utilization of health care services are fundamental aims of the Medicare program. See Gosfield, supra, at 234 & n.38; Columbia Note, supra, at 1494-95, 1499, 1502-06; S.Rep.No. 404, 89th Cong., 1st Sess. (1965), reprinted in (1965) U.S.Code Cong. & Ad.News 1943, 1971-72, 1987. These policies underlie the system of utilization review committees, as well as the exclusion of non-necessary services, and the prohibition against reimbursing custodial care. (1965) U.S.Code Cong. & Ad.News, supra, at 1971-72. Indeed, Congress was aware that hospital stays prolonged beyond the date that a patient was ready to be placed in a nursing facility were a major factor contributing to the overutilization of hospital services. Id. at 1971-2, 1987; Gosfield, supra, at 234 n.38. Thus, the Medicare program reflects a congressional judgment that the federal government should not readily reimburse a health care provider when its services have not been utilized properly. This concept of controlling costs by discouraging overutilization informs our resolution of the present controversy.
 
 II.
 
 7
 In this appeal Monmouth presses claims for services rendered to several Medicare-eligible patients who were hospitalized at various times during 1975-1977 for acute medical care. All of these patients remained in Monmouth Medical Center after they no longer required acute-level care because the hospital could not immediately secure a bed in a lesser-care facility. The lack of available nursing home beds was primarily attributable to the nursing home bed shortage in New Jersey, although delay in assigning Medicaid numbers to patients was also a factor.[3] It is undisputed that Monmouth was diligent in its efforts to find suitable nursing home placements for the patients. The hospital's utilization review committee scrutinized the care rendered to each patient involved in the present dispute, and in each instance the committee found that continued high level hospital care was no longer necessary after a certain date. The committee then chronicled the after-care needs of the patients and the constraints imposed by the nursing home bed crisis, and concluded that in each case the entire hospital stay was "justified." Significantly, it was social and economic considerations, such as the lack of family support networks and other alternative placements, that led to the findings of "justification"; the committee did not deem extended acute-level hospital care "medically necessary."
 
 
 8
 Monmouth submitted claims for reimbursement for the entire duration of each patient's hospital stay. Prudential Insurance Co., a fiscal intermediary to which the Secretary of HHS has delegated the initial responsibility for administering Medicare, declined to cover the portions of the stays that took place after the patient no longer needed acute level care. Prudential denied reimbursement on the ground that the care rendered during this time was not "reasonable and necessary for the diagnosis and treatment of illness" as required by 42 U.S.C. § 1395y(a)(1), and that such care consisted of services comprised within the "custodial care" exclusion, 42 U.S.C. § 1395y(a)(9). The fiscal intermediary also determined that the individual patients could not have known that the care would not be covered by Medicare, and it therefore waived their liability for the hospital costs. 42 U.S.C. § 1395pp(a). It refused to waive Monmouth's responsibility for paying for the care, however, reasoning that the hospital knew or should have known that the services fell within the exclusion for custodial care. The consequence of these determinations is that the individual patients will not have to pay any portion of their unreimbursed hospital bills, but Monmouth will have to absorb the costs of the services, at least for those patients ineligible to receive Medicaid compensation.[4]
 
 
 9
 Administrative review of each of these decisions was sought, but HHS upheld the denial of reimbursement throughout the administrative appeals process. Monmouth then filed for judicial review in federal district court, under 42 U.S.C. §§ 405(g), 1395ff(b), and § 1395pp(d), seeking relief in the form of reimbursement for the disallowed claims. The hospital also alleged that the administrative hearing procedure was not consistent with due process, because there was no opportunity for a hearing "before benefits were terminated."
 
 
 10
 Both Monmouth and HHS moved for summary judgment in the district court. The judge granted the government's motion, agreeing with the contention that the extended stays were not reimbursable. Monmouth Medical Center v. Harris, 494 F.Supp. 590 (D.N.J.1980). The district court reasoned that because the Medicare Act excludes coverage for unskilled custodial care, and because Monmouth apparently did not challenge the administrative determination that the care did not rise to the level of skilled services, unskilled care could not be reimbursed even when delivered in a hospital. After considering Monmouth's due process claim, the district judge concluded that the multi-layered review process afforded to providers before any coverage determination becomes final satisfied the procedural due process criteria set forth by the Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
 
 
 11
 The district judge then indicated that some of the medical records of patients involved in the present controversy revealed that the hospital actually may have rendered skilled, rather than custodial care, to a few patients. Skilled care is reimbursable under Medicare, even when it must be administered in an acute care facility because of a lack of available skilled nursing beds. Hultzman v. Weinberger, 495 F.2d 1276 (3d Cir. 1974). Inasmuch as Monmouth had not proceeded on the theory that some patients had received skilled care after they no longer required acute-level hospital services, the district judge suggested that the hospital might move for leave to amend its complaint with regard to the appropriate patients. 495 F.Supp. at 600, n.9. Monmouth pursued this suggestion and filed a motion for leave to amend the complaint, which was held in abeyance pending resolution of this appeal.[5]
 
 
 12
 To preserve the appealability of the order entering summary judgment in favor of HHS once the motion to amend the complaint injected unresolved multiple claims into the case,[6] the district judge entered an order pursuant to Fed.R.Civ.P. 54(b). This order certified that the issues raised by the proposed amended complaint are distinct from the question decided on summary judgment, and that there is no just reason to delay appellate resolution of the question addressed in the summary judgment order. D.N.J., No. 78-3139, order filed Feb. 17, 1981. Accordingly, we have jurisdiction to adjudicate this appeal, which presents solely the issue whether Medicare must reimburse a hospital for care that admittedly did not constitute skilled services,[7] when the patients remained in the hospital longer than medically necessary because nursing home beds could not be obtained for them.
 
 III.
 
 13
 Throughout the administrative process and before the district court, Monmouth did not contest the fact that the care each patient received while awaiting nursing home placement was less than "skilled care." In the oral argument to the district judge Monmouth verified that "there is no dispute by the hospital (or) HEW that the patients did not need an acute care setting. The care rendered could have been rendered in a lesser-care facility They (the patients) still needed a certain level of care, but that care did not meet the definition of skilled care." District Court transcript, Mar. 17, 1980, at 10-11.
 
 
 14
 Before this Court, Monmouth argues that its admission that the patients did not receive skilled care is not tantamount to a concession that the patients received custodial care within the meaning of the Medicare Act. Rather, Monmouth contends that the patients were given "intermediate" care and that Medicare should cover such care under the circumstances of this case.
 
 
 15
 The statute and regulations are dispositive of Monmouth's argument: Medicare simply does not recognize "intermediate" nursing care as a reimbursable level of care. The statute authorizes payment for only one level of post-hospital extended care, namely skilled services. It denies reimbursement for all lesser levels of nursing care, which the statute generally denominates as custodial care. The realization that Medicare is intended to encompass only skilled aftercare is reinforced by the HHS regulation defining "custodial care" as any care which does not meet the definition of skilled care. 42 C.F.R. § 405.310(g). Although as a factual medical matter, health care personnel might discriminate among several levels of post-hospital care and identify some services as skilled, others as intermediate, and a third group as merely custodial, as a legal matter, for purposes of the Medicare, as opposed to the Medicaid, program, Congress has chosen to differentiate only two levels of aftercare. Thus, for Medicare reimbursement purposes all types of care that do not rise to the level of skilled nursing care are distinguished from such skilled services by the designation "custodial care."
 
 
 16
 In urging this Court to recognize that the patients here received "intermediate" level care, Monmouth implicitly seeks to graft a Medicaid coverage standard onto the Medicare program. Medicaid specifically covers intermediate-level nursing care, whereas Medicare does not. Compare 42 U.S.C. § 1395x(h) with 42 U.S.C. § 1396d(a)(15); see Gosfield, supra, at 232, 250. Before the district court Monmouth acknowledged the distinction drawn by Congress, stating that "(o)ne of the statutory problems is the fact that for Medicare purposes the statute defines lesser care as skilled nursing facility and for Medicaid purposes we get much more sophisticated and talk of skilled nursing facility (and) intermediate care facility." Tr. at 10-11.
 
 
 17
 The varying degrees of coverage provided by Medicare and Medicaid represent a deliberate congressional choice. Enacted simultaneously as separate titles of the Social Security Amendments of 1965,[8] the two programs are designed to meet different health care needs of two identifiable segments of the population. Medicare is essentially an insurance program whose aim is to provide only "basic" protection for the aged, whether or not they are financially needy. 42 U.S.C. § 1395. Medicaid, as pointed out earlier, see p. 76 supra, is purposefully more comprehensive, since Congress sought to provide for a diverse range of medical needs of persons who generally could not afford health care services. See 42 U.S.C. § 1396. Thus, Medicaid's coverage of intermediate-level care does not indicate that Medicare should also reimburse something less than skilled care. Indeed, Congress' recognition of an intermediate level of nursing care in the Medicaid context lends support to the conclusion that Congress deliberately declined to include such care within the Medicare program.
 
 
 18
 The answer to the question posed by this appeal,[9] is therefore inescapable: the statute authorizes reimbursement only for nursing home services that constitute skilled care; all other nursing services, whether medically labelled "intermediate care" or "custodial care," are not covered by Medicare.
 
 
 19
 Monmouth seeks to rebut this conclusion by relying on several cases granting Medicare reimbursement for hospital stays that were extended when a lesser care facility was not immediately available. See, e. g., Hultzman v. Weinberger, 495 F.2d 1276 (3d Cir. 1974); Hayner v. Weinberger, 382 F.Supp. 762 (E.D.N.Y.1974); Messinger v. Weinberger, (1975 Transfer Binder) CCH Medicare and Medicaid Guide P 27,564 (S.D.W.Va.1975); White v. Weinberger, (1975 Transfer Binder) CCH Medicare and Medicaid Guide P 27,549 (D.Vt.1975). When the facts of these cases are examined, however, it is readily apparent that each is distinguishable from the matter at hand. In Hultzman, as well as the other cases, the court found that the patients received skilled services while detained in the hospital, and that they awaited placement in a skilled extended care facility rather than in an intermediate level or custodial nursing home. To put it another way, the care rendered to these patients was a level of care covered by Medicare, and Medicare undoubtedly would have reimbursed the skilled nursing facility if the transfer had occurred as soon as the patient was ready to be moved. Under these circumstances, it would have been inequitable to deny coverage for skilled care, which was administered in a hospital solely because of extenuating social circumstances, when coverage would have been provided for skilled care in an appropriate lesser-care facility. See, e. g., Hayner v. Weinberger, 382 F.Supp. 762, 765 (E.D.N.Y.1974).[10]
 
 
 20
 In the present case, the level of care delivered to Monmouth's patients would not have been covered once they were placed in nursing homes. Thus, there is no inequity arising from the government's refusal to reimburse the hospital for an uncovered service that would not have been funded absent the nursing home bed shortage.
 
 
 21
 Despite the crucial factual distinctions between Hultzman and Hayner and the present dispute, the hospital in effect seeks to interpret the holdings in the previous cases as announcing a general rule that the critical factor for Medicare reimbursement is where care is delivered, rather than the type or level of care administered. Monmouth contends that because there was no alternative to rendering the unskilled nursing services in a hospital, Medicare should provide reimbursement in this instance, because the program generally covers inpatient hospital care. The message to be derived from cases discussing both Medicare and Medicaid coverage, however, is that the level of care given to patients is determinative of coverage, rather than the place in which the care is administered. See, Columbia Note, supra, at 1504-05. For example, in Hayner v. Weinberger, supra, which held that Medicare must reimburse the "skilled" level of care rendered to a patient who was forced to remain in a hospital because of a shortage of skilled nursing facility beds, the court observed that if the level of care had been "custodial," or less than "skilled," it would not have been reimbursable even if it had been administered in a hospital or skilled extended care facility. 382 F.Supp. at 766.
 
 
 22
 The decision to regard the level or type of care as controlling is the only course consistent with the avowed congressional goals of discouraging overutilization of services and screening out unnecessary care. If a level of care normally not covered by Medicare were reimbursable simply because circumstances led a hospital to retain a patient longer than acute-level hospital care was medically necessary, hospitals would have scant incentive to secure expeditiously appropriate placements in lesser-care facilities.
 
 
 23
 Accordingly, we concur with the district court's holding that the unskilled level of services rendered to the patients involved in this appeal is not reimbursable under Medicare.
 
 IV.
 
 24
 As an additional basis for assailing the denial of Medicare coverage, Monmouth asserts that the procedure for ascertaining whether care is covered does not comport with due process. Essentially, the hospital contends that it has a due process right to be afforded a hearing before Medicare benefits are terminated.[11] To support this argument, Monmouth draws our attention to Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), a case in which the Supreme Court held that welfare recipients are entitled to a hearing before the flow of benefits comes to an end.
 
 
 25
 A similar due process argument focusing on the timing of hearings under Medicare was presented to the Sixth Circuit in Himmler v. Califano, 611 F.2d 137 (6th Cir. 1979). In Himmler a class of Medicare beneficiaries contended that HEW must provide notice and a hearing before reimbursement claims for medical expenses already incurred are rejected by the fiscal intermediary. The court held that the thorough administrative review procedures already in place were sufficient to satisfy due process.
 
 
 26
 In reaching this result the court rejected the argument that an "entitlement" to Medicare vests as soon as a utilization review committee judges care to be medically necessary.[12] Rather, the Sixth Circuit noted that while utilization review committees were empowered to make medical judgments, the ultimate authority to determine whether statutory coverage criteria apply to an admittedly necessary service remains with the Secretary of HEW.[13] Thus, the Court reasoned that a coverage decision does not become final until the ruling by a fiscal intermediary is either upheld or overturned by the Secretary. 611 F.2d at 140, 143-144.
 
 
 27
 The Sixth Circuit also disposed of the argument that Goldberg v. Kelly is relevant to a Medicare coverage decision. It noted that:
 
 
 28
 The due process analysis in Goldberg v. Kelly is not relevant to an individual's ultimate duty to pay for benefits received after he has had a hearing and has been determined to be ineligible for government aid Therefore, the reasoning of Goldberg v. Kelly is not relevant to the plight of Medicare recipients who are forced to pay for medical services after they have been afforded a hearing at which it was determined that the services they received were not covered by Medicare
 
 
 29
 A further consideration is whether Medicare beneficiaries are in any way deprived of a continuing benefit, like the welfare payments in Goldberg v. Kelly, by virtue of the fiscal intermediary's decision. The Medicare program gives eligible individuals the benefit of payment for medical services already rendered; it does not directly provide any entitlement to the medical services themselves Because the medical services will necessarily have been received by the individual before the fiscal intermediary makes the initial determination whether it will pay the bill for those services, its decision does not cause the kind of interruption of a continuing benefit which was at issue in Goldberg v. Kelly. The decision by the fiscal intermediary will in most instances work no deprivation at all, as the medical services will have already been received and the final determination of ultimate liability for payment for those services will be made only after the opportunity for a full hearing is afforded. Id. at 145-46 (emphasis in original).
 
 
 30
 This reasoning is especially compelling in the present situation, where the provider, rather than patients, is seeking additional procedural protection. If, as Himmler holds, a Medicare-eligible patient has no due process right to additional, or earlier, hearings, then the hospital itself should have no greater right. See 42 U.S.C. § 1395pp(d). A hospital's "need" for the government to recompense health care services it had to deliver to poverty-stricken patients can hardly be analogized to the individual's need, in Goldberg, for an uninterrupted stream of funds which provide basic sustenance.
 
 
 31
 We find the due process analysis of the Sixth Circuit in Himmler persuasive. The present case does not concern the "termination" of vested benefits: no patient has been deprived of needed medical treatment, and no right of the hospital either to receive payment or to continue to participate in the Medicare program has been cut off by the decision that it delivered services which did not fall within statutory coverage criteria. Because a coverage decision is not final until the Secretary has passed on a claim for reimbursement, it is apparent that Medicare providers have several opportunities to present their claims before benefits are denied. They may request the fiscal intermediary to reconsider its decision, they may then take their claim before an administrative law judge for an oral hearing, and they may appeal this ruling to an appeals council and eventually to the Secretary. 42 U.S.C. §§ 1395ff(b), 1395pp(d). Finally, providers may seek judicial review of the administrative decision, as Monmouth has done here. Only after Monmouth has exhausted all avenues through the federal court system will the denial of coverage in this matter become final. It is difficult to perceive how any additional opportunities could be extended to Monmouth by which it could feasibly and fruitfully press its claim. The only conceivable procedural alternative would be to hold a hearing before contemplated services are delivered to a patient or before a patient's need for acute care turns into need for only custodial care. Such a procedure, however, would not be practical and is not likely to augment significantly Monmouth's ability to protect its interests. See Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Too many contingencies may arise in the course of treating an ailment to enable a utilization review committee or a fiscal intermediary to pinpoint beforehand when certain services will cease to be medically necessary. Moreover, there is a distinct possibility that a requirement of a hearing before care is delivered would be deleterious to the health of individuals, who may be in too precarious a physical situation to await the outcome of administrative hearings before receiving needed care. See Himmler, supra, 611 F.2d at 147.
 
 
 32
 We therefore conclude that the extant review procedure fully affords due process to Monmouth Medical Center. Cf. Town Court Nursing Center v. Beal, 586 F.2d 266 (3d Cir. 1978) (en banc) (Town Court I ) (Medicare provider not entitled to hearing before HEW decides not to renew its provider agreement).
 
 V.
 
 33
 For the foregoing reasons, the judgment of the district court will be affirmed.
 
 
 
 [1]
 The details of the problem are recounted in New Jersey Ass'n of Health Care Facilities v. Finley, 83 N.J. 67, 415 A.2d 1147 (1980). In Finley, the New Jersey Supreme Court upheld the validity of the regulation promulgated by the Commissioner of Health to respond to the nursing home bed shortage. This regulation, N.J.A.C. 8:30-14.1, et seq., which requires nursing homes to make a certain number of spaces available to indigent patients, has helped to alleviate the difficulties hospitals face in securing nursing home beds for the poor
 
 
 [2]
 In this context, the specialized type of health care that requires inpatient treatment delivered in a hospital is known as "acute care." Institutions such as rehabilitation centers or nursing homes, which normally do not provide intensive care, are known as "lesser-care facilities."
 
 
 [3]
 Medicaid may cover the nursing home visits of patients such as those involved in this case, see 42 U.S.C. § 1396d(a)(15). Nursing homes, however, will not accept Medicaid-eligible patients until the individuals have received a number from the state agency that administers the program
 
 
 [4]
 Monmouth Medical Center was successful in previous litigation efforts to obtain reimbursement under Medicaid for patients awaiting nursing home placements. Monmouth Medical Center v. New Jersey, 80 N.J. 299, 403 A.2d 487 (1979), cert. denied, 444 U.S. 942, 100 S.Ct. 297, 62 L.Ed.2d 308 (1979). Under New Jersey regulations, Medicaid will fund only the portion of a service that is not already covered by Medicare or other health insurance. N.J.A.C. 10:49-1-7(a). Thus, once the hospital stay is no longer covered by Medicare, Medicaid will provide reimbursement, assuming, inter alia, that the type of care satisfies statutory coverage criteria
 
 
 [5]
 The proposed amended complaint pertains to 7 patients of the 28 named in the original complaints
 
 
 [6]
 Cf. Fed.R.Civ.P. 54(b) (multiple parties or multiple claims; resolution of one set of claims ordinarily not appealable until all are resolved, unless district court certifies appeal in initial matter); Jung v. K & D Mining Co., Inc., 356 U.S. 335, 78 S.Ct. 764, 2 L.Ed.2d 806 (1958); Elfenbein v. Gulf & Western Indus., Inc., 590 F.2d 445 (2d Cir. 1978) (order dismissing complaint but granting leave to amend not an immediately appealable final order); Borelli v. City of Reading, 532 F.2d 950, 951-52 (3d Cir. 1976)
 
 
 [7]
 In light of the pending motion to amend the complaint and the Rule 54(b) order, this appeal does not address the claims for reimbursement presented by the 7 patients named in the proposed amended complaint who allegedly received skilled care. See note 5, supra
 
 
 [8]
 Pub.L. No. 89-97, 79 Stat. 286 (1965). Medicare is title XVIII of the Social Security Act, and the Medicaid program is set forth in title XIX
 
 
 [9]
 The present case arises out of a purely legal dispute of statutory interpretation, rather than a factual disagreement regarding the level of care actually administered. It is therefore distinguishable from the numerous Medicare cases involving "level of care" determinations, where the courts were called on to settle disputes over whether a patient had received "skilled care" or lesser care. See, e. g., Hayner v. Weinberger, 382 F.Supp. 762 (E.D.N.Y.1974); Torphy v. Weinberger, 384 F.Supp. 1117 (E.D.Wis.1974); White v. Weinberger (1975 Transfer Binder) CCH Medicare and Medicaid Guide P 27,549 (D.Vt.1975). In order to adjudicate these cases, the courts had to devise various definitions of "custodial care" in the medical sense, so they could assess whether the services delivered to the patients rose to the level of skilled care. See, e. g., Coe v. Secretary of HEW, 502 F.2d 1337, 1340 (4th Cir. 1974); Sowell v. Richardson, 319 F.Supp. 689 (D.S.C.1970)
 We need not embroil ourselves in the debate over an appropriate definition of "custodial care" in this case, however, since Monmouth does not dispute that the patients received a lower level of care than "skilled" services.
 
 
 [10]
 The Secretary and Congress have adopted the same view. 42 C.F.R. § 405.1627(a)(2) (1980) provides that when an individual who requires skilled nursing facility care must remain in an acute-level facility because an appropriate placement is not immediately available, Medicare will reimburse the provider at the inpatient hospital services rate. This regulation is consistent with a provision in the recently enacted Medicare and Medicaid Amendments of 1980, Pub.L.No. 96-499, § 902, 94 Stat. 2612 (to be codified at 42 U.S.C. § 1395X(v)(1)(G)). It can be inferred from these specific provisions, which deal with the circumstances where a covered level of service is administered in a higher-level facility than necessary, that Congress did not intend to reimburse an uncovered level of care in similar situations
 
 
 [11]
 The government suggests that to the extent Monmouth asserts the patients' procedural due process rights, it lacks standing. In light of our approval of the rationale in Himmler v. Califano, 611 F.2d 137 (6th Cir. 1979), a case in which the court rejected a due process argument advanced by Medicare-eligible patients, as a practical matter it is unnecessary to resolve this standing question, because Monmouth would fare no better in asserting the patients' constitutional claims than it does in advancing its own rights
 HHS does not contest Monmouth's standing to assert its own due process interests implicated by a Medicare reimbursement decision, however. Insofar as Medicare funds are paid directly to providers, 42 U.S.C. §§ 1395d, 1395f, and the effect of the Secretary's decision here places the entire financial onus on the hospital, we agree that Monmouth has demonstrated the requisite injury to confer standing to assert that its own due process rights have been violated. Cf. Town Court Nursing Center, Inc. v. Beal, 586 F.2d 266, 275 (3d Cir. 1978) (en banc) (Town Court I ) (Medicare provider has standing to assert due process challenge against method by which HEW terminates its provider agreement). Consequently, our holding on the merits is confined to the question whether the provider in this case itself has a due process right to a pre-termination hearing.
 
 
 [12]
 Even assuming this argument to be true, it is noteworthy that in this case Monmouth's utilization review committee agreed that continued acute-level hospital care was not necessary, and it found merely that the extended stays were "justified" for essentially social reasons. Thus, Monmouth may not seek refuge in the judgment of its utilization review committee for the purpose of advancing an entitlement argument
 
 
 [13]
 As one commentator has observed, fiscal intermediaries cannot reimburse for services excluded from coverage even though utilization review entities determine that the services are medically necessary. Gosfield, supra, at 258