**UNITED STATES of America**

v.

**Anthony J. PISANI, M.D., Appellant.**

**No. 80–2088.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 20, 1981.

Decided April 20, 1981.

Dennis A. Drazin (argued), Drazin & Warshaw, Red Bank, N. J., for appellant.

William W. Robertson, U. S. Atty., Robert J. Del Tufo, Maryanne Desmond, Robert Beller (argued), Asst. U. S. Attys., Newark, N. J., for appellee.

Before GIBBONS, VAN DUSEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

Defendant Dr. Anthony J. Pisani appeals from a judgment for $151,413. which the district court entered against him after a trial without a jury. The judgment held Pisani personally liable for Medicare overpayments which the former Department of Health, Education and Welfare ("HEW") made to his solely-owned corporation, Eaton Park Associates, Inc. ("corporation"). This court has jurisdiction under 28 U.S.C. § 1291 (1976). We affirm.

### I. FACTS

From January 18, 1967, to February 28, 1970, the corporation, doing business as Eaton Park Nursing Home ("Provider"), participated in the Medicare program. During this time, Prudential Insurance Company was the fiscal intermediary between the Provider and HEW, and it supervised the nursing home's financial participation in the Medicare program and advanced interim reimbursements to the home for Medicare services.

Under the Medicare program, an intermediary makes interim payments to providers of services based on their estimated monthly patient costs. To verify these estimates, the providers must submit to the intermediary an annual cost report, verifying their actual costs in caring for Medicare patients. These reports are subject to audit by the intermediary or a subcontracted accounting firm. HEW uses these annual audits to determine if a provider has been overpaid or underpaid by its interim payments.

The Provider (Eaton Park) submitted annual cost reports for 1967, 1968, and 1969. Prudential's accounting firm, Peat, Marwick, Mitchell & Co., could not audit the annual cost reports because Pisani could or would not provide the records it needed to conduct an audit. HEW then surveyed comparable nursing home providers and used the average per diem patient cost of Golden Crest Nursing Home to calculate the Provider's actual costs. The Department believed that Golden Crest was comparable to the Provider. As a result of the survey, HEW determined that $151,413. of the $546,361.25 paid to the Provider for Medicare services was an overpayment. The corporation never repaid the $151,413. since it had no assets. On March 27, 1972, "the corporate entity . . . became void" for failure to pay state taxes. Finding 19, App. 29; Supp.App. 253–54.

Pisani was president, registered agent, and sole stockholder of the corporation during the Provider's participation in the Medicare program. He used personal funds, often obtained through personal bank loans, to finance the corporation. He also loaned money to the corporation. It always operated at a loss, was undercapitalized, and never paid dividends. Pisani kept no corporate minute books and observed no corporate formalities. He testified that all the corporate records were in a briefcase which was stolen from the trunk of his car, but the district court did not believe this testimony.[1]

The June 30, 1967, financial statement for the corporation showed that Pisani had loaned $184,922.67 to the corporation, but its annual cost report for the fiscal year ended June 30, 1969, showed that this debt was reduced from $169,610.60 to zero during that year. Pisani testified that he received $25,000. of a $200,000. personal bank loan, which was secured by all the corporation's stock, and that he received the $25,000. as partial repayment of his loans to the corporation. Supp.App. 149–151. His accountant, Mr. Petrics, testified that $100,000. of the loan was used to repay the corporation's debt to Pisani. Although Pisani repeatedly denied that the loans were repaid, he later admitted that he signed documents showing that the corporation repaid $116,000. to him. Supp.App. 156–58. He knew during the time the corporation repaid his loans that it was on the verge of financial collapse. The nursing home was sold at a foreclosure sale in January 1970 after it defaulted on its mortgage payments.

The district court held Pisani liable for the $151,413. of overpayments as the alter ego of the corporation. It used the cost figures which HEW obtained from Golden Crest, instead of the average cost data for all New Jersey nursing homes. HEW had determined that Golden Crest was a comparable facility. Finally, the court rejected defendant's claim that laches barred the Government's suit.[2]

## II. DISCUSSION OF LAW

### A. *Controlling Law: Federal or State*

This court must first determine whether federal or New Jersey law controls

---

1. Ample evidence supports disbelieving Pisani. He frequently (1) gave inconsistent testimony, (2) changed his testimony, and (3) admitted that his prior testimony and deposition answers had been incorrect. *See* Supp.App. at 129–60, 187–253. His testimony about the allegedly stolen corporate records is extremely vague. *Id.* at 214–18.

2. The late Judge Barlow's bench opinion denying Pisani's motion for summary judgment, App. 16–23, reached the same conclusion as did Judge Thompson's final opinion on piercing the corporate veil to hold Pisani individually liable. Judge Barlow also rejected a statute of limitations defense, which defendant later apparently abandoned in favor of arguing laches. See part II–C below.

the issue of Pisani's individual liability for overpayments to the corporation. We hold that federal law applies under *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). "[F]ederal law governs questions involving the rights of the United States arising under nation-wide federal programs." *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). *Kimbell Foods* stated:

> "[T]he priority of liens stemming from federal lending programs must be determined with reference to federal law. The SBA [Small Business Administration] and FHA [Farmers Home Administration] unquestionably perform federal functions within the meaning of *Clearfield.* Since the agencies derive their authority to effectuate loan transactions from specific Acts of Congress passed in the exercise of a 'constitutional function or power,' *Clearfield Trust Co. v. United States, supra,* at 366 [63 S.Ct. at 574], their rights, as well, should derive from a federal source.... In such contexts, federal interests are sufficiently implicated to warrant the protection of federal law."

*Id.* at 726–27, 99 S.Ct. at 1457–58. *Cf. United States v. Yazell,* 382 U.S. 341, 357, 86 S.Ct. 500, 509, 15 L.Ed.2d 404 (1966) (not reaching issue whether federal law governed since federal rule would incorporate state rule).

The federal statute which sets guidelines for the Medicare program is the source of the Government's right to recover overpayments. Thus, federal law governs.

In deciding what law to adopt as the federal rule for this case, this court could adopt New Jersey law or fashion a uniform federal rule of decision. *See Kimbell Foods,* 440 U.S. at 728, 99 S.Ct. at 1458. Several factors are relevant to this choice.

First is whether a need for national uniformity exists. Second is the extent to which "a federal rule would disrupt commercial relationships predicated on state law." *Id.* at 729, 99 S.Ct. at 1459. Finally, and most important here, "we must also determine whether application of state law would frustrate specific objectives of the federal programs. If so, we must fashion special rules solicitous of those federal interests." *Id.* at 728, 99 S.Ct. at ˙1458.

■ We hold that here a uniform federal rule is needed since state law could frustrate specific objectives of the Medicare program.[3] One objective is prompt reimbursements to providers. Interim payments to providers must be made quickly so that they will be encouraged to treat Medicare patients. If HEW did not make prompt payments (including those by intermediaries) because it had to carefully investigate each provider's actual costs and financial condition prior to making payments, many providers might be unwilling or unable to offer Medicare services. To fulfill the goals of the Medicare program, HEW must be able to make prompt payments without the fear that doctors will use corporations with no assets to avoid returning overpayments. As discussed in part II–B below, a court should not permit avoidance of liability for overpayments by a person who is the alter ego of a defunct corporation.

Another specific objective of the Medicare program is that providers of services receive payments only for the reasonable costs of their services. *See Monmouth Medical Center v. Harris,* ˗ 646 F.2d 74 (3d Cir. 1981).[4] This goal also makes a uniform federal rule desirable. Return of overpayments is crucial to this goal. If Congress had intended that Medicare be a welfare program for doctors and hospitals, then the return of overpay-

---

3. *Cf. Audit Services, Inc. v. Rolfson,* 641 F.2d 757 (9th Cir. 1981) (federal law governs piercing corporate veil to recover unpaid pension contributions, even though United States is not a party); *Seymour v. Hull & Moreland Engineering,* 605 F.2d 1105, 1110–11 (9th Cir. 1979) (same).

4. This opinion states: "Insuring fiscal responsibility, curtailing health care costs, and eliminating the over-utilization of health care services are fundamental aims of the Medicare program." At 76 (citations omitted).

ments would not be so important. The overpayments would be going to those Congress intended to benefit. We believe, however, that Medicare was intended solely to assist patients. The Small Business Administration ("SBA") loans in *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), and *Kimbell Foods* went to the parties Congress intended to benefit. Although the United States sued a third party in *Kimbell Foods* (over conflicting security interests), that third party had loaned money to the recipient of an SBA loan, thus aiding the person Congress intended to help. These cases also held that the Government agency could adequately protect its interests under state law, and thus adopted state law as the federal rule of decision.

Another factor favoring a federal rule is the need for uniformity in the Medicare program. SBA loans are not intended to be uniform nationwide, but the system for Medicare reimbursements is intended to be uniform. Medicare reimbursements are unlike the voluntary SBA loans in *Yazell* and *Kimbell Foods*. *Yazell* incorporated state law because: (1) the loan was individually negotiated and apparently was intended to be governed by Texas law, (2) applying Texas law impaired no substantial federal interest, and (3) no need for national uniformity existed. None of these factors apply to Pisani and his Medicare overpayments. In *Yazell*, the parties looked at least partially to Texas law when they negotiated the "custom-made, hand-tailored" loan transaction. 382 U.S. at 346, 348, 86 S.Ct. at 503, 504. Pisani, however, received payments under a uniform statutory scheme. HEW pays all providers of Medicare services, even before their costs are audited. The statute requires HEW to pay "each provider of services with respect to the services furnished by it ... not less often than monthly ... and prior to audit or settlement ... with necessary adjustments on account of previously made overpayments or underpayments." 42 U.S.C.A. § 1395g(a) (Supp.1980). Payments are based on the provider's reported costs, not

on any perceived ability to repay. HEW's only control is the "day of reckoning" for overpayments. The nonuniform law of different states, some of which may apply a restrictive test for piercing the corporate veil, could frustrate this day of reckoning.

Cases have recognized a need for uniformity in certain areas. *United States v. Sommerville*, 324 F.2d 712 (3d Cir. 1963), *cert. denied*, 376 U.S. 909, 84 S.Ct. 663, 11 L.Ed.2d 608 (1964), fashioned a uniform federal rule to govern the liability of "an auctioneer who sells livestock covered by an FHA security agreement without actual knowledge of that coverage." *Id.* at 714. *United States v. Carson*, 372 F.2d 429, 431, 433 (6th Cir. 1967), followed *Sommerville*, holding that *Yazell* did not affect its validity. *Carson* held that *Yazell* did not apply because in *Carson* the contract was not individually negotiated, 372 F.2d at 433–34, and the defendant was not a party to the contract, *id.* at 434. Both considerations apply to Pisani, although the second consideration is not as significant, since the defendant in *Kimbell Foods* was a third party. Unlike the defendant in *Kimbell Foods*, however, Pisani is not truly a distinct third party, see part II–B below, and here no interest of a distinct third party is affected. *See generally United States v. Independent School Dist. No. 1*, 209 F.2d 578, 580–81 (10th Cir. 1954); *Stone v. United States*, 286 F.2d 56, 59 (8th Cir. 1961).

B. *Piercing the Corporate Veil*

We do not reach the issue whether New Jersey law would permit piercing the corporate veil here. We have not found or been referred to any New Jersey cases which explicitly adopt the alter ego theory, relied on by the district court, in the absence of fraud. New Jersey law thus might be more restrictive than the cases relied on by the trial court. In any event, we believe it is undesirable to let the rights of the United States in this area change whenever state courts issue new decisions on piercing the corporate veil.

■ To fashion a federal rule, we turn to cases which articulate the alter ego theory.[5] *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir. 1976), sets out in detail the relevant factors. First is whether the corporation is grossly undercapitalized for its purposes. Other factors are

"... failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, nonfunctioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders."

*Id.* at 686–87 (footnotes omitted). Also, the situation "must present an element of injustice or fundamental unfairness," but a number of these factors can be sufficient to show such unfairness. *Id.* at 687. The district court opinion considered these factors carefully. It stated:

"The corporation was undercapitalized and, in my view, the corporate formalities were not observed notwithstanding Dr. Pisani's testimony that corporate records had been maintained but stolen. The corporation did not pay dividends and eventually became insolvent. The reduction of the corporation's indebtedness to Dr. Pisani from approximately $184,000 in 1967 to $0 in 1969 indicates that Dr. Pisani siphoned corporate funds."

App. 33. See also Findings 12, 13, 19–31, App. 28–31, and bench opinion by Judge Barlow, App. 17–19 (*see* n.2 *supra*).

*United States v. Normandy House Nursing Home, Inc.*, 428 F.Supp. 421 (D.Mass. 1977), is the case most nearly on point here. There, the district court denied a motion to dismiss because it held that an issue of fact existed as to whether the defendant doctor was the alter ego of the nursing home corporation. He was the sole shareholder. The provider corporation had sold all its assets and ceased operating as a nursing home at the time the audits were beginning. The court held that, despite the lack of allegations of fraud, the doctor could be liable if the sale of assets was carried out to avoid returning overpayments to HEW. It also held, alternatively, that it could pierce the corporate veil to prevent circumvention of a statute or avoidance of a clear legislative purpose. The legislative purpose, the court found, was paying only the reasonable cost of Medicare services, and the corporate form could circumvent this goal under the alleged facts of the case.

Pisani's situation is remarkably similar to that of the doctor in *Normandy House Nursing Home*. Also, additional factors not present there, but present here, favor piercing the corporate veil in this case. Pisani followed no corporate formalities, operated the corporation with his personal funds, loaned large sums to the corporation and then repaid the loans to himself with corporate funds while the corporation was failing, and kept the corporation undercapitalized by loaning it money instead of investing equity in it. These facts are relevant under *DeWitt Truck Brokers*.

■ Pisani also falls under the alternative holding of *Normandy House*, since the Medicare statute can be circumvented if he is not personally liable. Owners of nursing homes would be able to operate them with all the financing in the form of loans, with little or no equity, and then submit inflated cost reports. After receiving the overpayments, an owner could have the corporation repay his loans and then put the corporation

5. *Zubik v. Zubik*, 384 F.2d 267 (3d Cir. 1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968), stated that the corporate existence could be disregarded to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy...." *Id.* at 272. It did not explicitly adopt the alter ego theory, and it apparently relied at least partially on federal rather than state law. *Id.* at 273. *Zubik*, however, involved a corporate tort and the court recognized that business transactions often involve much stronger cases for piercing the veil of an undercapitalized corporation. *Id.* A party to a contract may have relied on conduct by the defendant shareholder, while tort plaintiffs like those in *Zubik* usually never knew the shareholder, much less relied on his conduct or representations.

through bankruptcy. By keeping few or no records, the owner would make it difficult for HEW to prove fraud. Without fear of individual liability, such an owner would have an incentive to encourage overpayments and then delay audits and collection efforts until after bankruptcy. If HEW had to prove fraud where such a defendant kept no corporate records and inadequate books, such schemes would be difficult to prevent. Thus, we hold that this case is appropriate for applying the alter ego doctrine as set forth in *DeWitt Truck Brokers*, 540 F.2d at 686–87, to pierce the corporate veil. For a case articulating most of the same factors for the alter ego doctrine as those listed in *DeWitt Truck Brokers*, see *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Man., Inc.*, 519 F.2d 634, 638 (8th Cir. 1975).

## C. Statute of Limitations and Laches

Pisani argues on appeal that the statute of limitations or laches bar the Government's suit. His counsel apparently abandoned the statute of limitations defense in the district court.[6]

■ In any event, we note that the Government's action is founded upon a contract and thus is governed by a six-year statute of limitations. 28 U.S.C. § 2415(a) (1976). The statute does not begin to run on Medicare overpayments until final audit is completed. *United States v. Withrow*,

593 F.2d 802 (7th Cir. 1979); *Normandy House Nursing Home*, 428 F.Supp. at 423. Here, no audit was completed since the Provider and Pisani failed to supply adequate records. The United States filed this action on April 3, 1975. The earliest date for the limitations period to have begun was on April 5, 1971, when Prudential advised the Provider that the entire $546,000. would be considered an overpayment and that the General Accounting Office ("GAO") would begin collection efforts, unless the Provider produced adequate records. Suit was filed less than four years later.

■ We believe, moreover, that the statute did not begin to run until at least August 1973. In April 1971, Pisani's attorney notified Prudential that records were available to substantiate the Provider's costs, and requested that referral to GAO be delayed while Peat, Marwick again attempted to audit the home. Peat, Marwick did attempt another audit in November 1971, but did not succeed since the records were still insufficient. HEW then surveyed comparable nursing homes,[7] completing the survey in August 1973. HEW considered August 1973 to be the final audit date.[8] Thus, the six-year period had clearly not yet run on April 3, 1975.[9]

■ We agree with the district court[10] that Pisani did not prove laches. Any delay

---

**6.** Pisani's counsel stated:

"However, I will frankly concede to the Court that under the Government's position and under the case law, the statute does not begin to run until you have a final audit. It appears from the testimony that the Government, for whatever reasons, did not complete their final audit until a point in time when they would be within the statute. So I would argue more laches than the statute of limitations and estoppel because of the time lag." Supp.App. 331–32. Thus, the trial judge never discussed the statute of limitations defense in her opinion.

**7.** See part II–D below.

**8.** Even if the three-year period for tort actions, 28 U.S.C. § 2415(b) (1976), were applied as Pisani urges, this period would probably begin in August 1973, when HEW should have dis-

covered the amount of overpayments, and would not have expired on April 3, 1975.

**9.** *United States v. Upper Valley Clinic Hospital*, 615 F.2d 302, 306 (5th Cir. 1980), held that the limitations period begins to run anew when a provider promises to supply cost reports. Even under this analysis, the six-year period began in April 1971 and the statute had not run on April 3, 1975.

**10.** The court stated:

"I am not convinced that the Department received notice of the sale of the corporation's assets or that intervention by the Department at the time of sale would have protected its interests. Accordingly, Dr. Pisani has established the existence of neither inexcusable delay on the part of plaintiff nor prejudice to defendant. Under these circumstances, the doctrine of laches is no bar to

in filing the action was primarily due to the request of Pisani's counsel for delays.

### D. *Damages*

■ Pisani claims that the damages are excessive since HEW did not use the average cost figures for New Jersey nursing homes. We disagree. HEW was entitled to use the cost data for a facility which it considered to be comparable, even if this facility had below-average costs. Any other rule would encourage providers with below-average costs to submit inflated cost figures and then keep no records, or destroy or hide existing records. Such fraudulent actions would be rewarded by permitting reimbursements for average costs under the rule defendant urges us to adopt.[11]

HEW's determination that it overpaid the Provider by $151,413. is not arbitrary or capricious. Pisani failed to meet his burden of proving that the Provider's costs were higher than those of Golden Crest. Thus, we affirm on the issue of damages.

### III. CONCLUSION

The district court's findings on the issues raised on appeal were not clearly erroneous. We hold that the district court correctly applied the law on these issues and did not err in holding that Pisani failed to prove his affirmative defenses. The judgment of the district court will be affirmed.

---

relief. *See Gardner v. Panama Rail[road] Co.*, 342 U.S. 29, 31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951)."
App. 37. The findings of facts included in this passage are not clearly erroneous, and Pisani did not meet his burden of proving the affirmative defense of laches.

11. HEW could have deemed the entire $546,-361.25 to be overpayments. 42 U.S.C.A.

§ 1395g(a) (Supp.1980); *United States v. Upper Valley Clinic Hospital*, 615 F.2d 302, 306 n.8 (5th Cir. 1980). This result would be harsh, but it could be justified as a strong incentive to keep adequate records. Records are particularly important because Medicare does not reimburse many health services. *Monmouth Medical Center v. Harris*, 646 F.2d 74 (3d Cir. 1981).