Accordingly, the judgment of the Tax Court is affirmed.

---

IRVING SENDAR, AILEEN MARMON, AS EXECUTRIX OF THE ESTATE OF DR. MARTIN G. MARMON, AND TWIN OAKS NURSING HOME, INC., PLAINTIFFS–APPELLANTS, v. THE STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, AND LEON R. BARTOL, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 10, 1989—Decided February 6, 1989.

---

[1] *N.J.R.* 3142(c).

Before Judges ANTELL, DREIER and BROCHIN.

*Carmine A. Iannaccone* argued the cause for appellants (*Hannoch Weisman,* attorneys; *Carmine A. Iannaccone,* on the brief).

*Ivan J. Punchatz,* Deputy Attorney General argued the cause for respondents (*Cary Edwards,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* of counsel; *Lillian Lewin Bursick,* on the brief).

The opinion of the court was delivered by

DREIER, J.A.D.

Plaintiffs [1] appeal from a Law Division order upholding but limiting the effect of a certificate of debt filed by the Director

---

[1] All three plaintiffs have appealed, including the corporation, Twin Oaks Nursing Home, Inc. Although as late as oral argument before us plaintiffs' attorney had eschewed any relief on behalf of the corporation, by an amended notice of appeal filed post-argument, plaintiffs now claim relief on behalf of all three plaintiffs.

of the Division of Medical Assistance and Health Services. The certificate was entered as a judgment by the Clerk of the Superior Court against plaintiffs Irving Sendar and Aileen Marmon, Executrix of the estate of her late husband, Dr. Martin . G. Marmon. The certificate was filed pursuant to *N.J.S.A.* 30:4D–17(h), a section of the New Jersey Medical Assistance and Health Services Act. Plaintiffs argue that this section of the Act is unconstitutional in its application to them, since a judgment should not be entered prior to their having an opportunity to be heard on the merits of the State's claim. Furthermore, plaintiffs claim that the filing of the certificate against them as stockholders of a former corporate recipient of payments from the Medicaid program also failed to accord them due process. They contend that their claim under 42 *U.S.C.A.* § 1983 should not have been dismissed.

The trial judge refused to vacate the certificates, but construed them as merely inchoate liens against plaintiffs' property, incapable of supporting an execution proceeding unless or until there is a final adjudication of plaintiffs' responsibility. We agree with the trial judge's limitation on the effect of the certificate. However, we do not agree that the certificates could be filed against the individuals without a threshold showing of either their responsibility based upon mistaken or improper receipt of Medicaid payments made to the corporation or as active managers of the corporation.

Plaintiffs Irving Sendar and the Estate of Martin G. Marmon each own 50% of the stock in Twin Oaks Nursing Home Inc., the former owner of a Morristown, New Jersey nursing home which participated in the Medicaid program. The nursing home was established in 1972, and in 1984 the corporation assigned its lease and the physical assets to a new nursing home operator. Marmon was the company's president; Sendar was never an officer or director of the nursing home corporation, but he apparently did take some "active role" in the company. In 1985, the defendant Division of Medical Assistance and Health Services began a field audit of Twin Oaks. The preliminary

field audit concluded that Sendar (not the company or Marmon), owed the defendant $646,639.37 for Medicaid overpayments made to the company over a ten-year period. A supplemental determination added Marmon and the corporation. All of the years of operation have not been finally audited, even at this point.

On December 11, 1987, the Division sent Sendar a letter notifying him that it was filing a certificate of debt against him for the $646,439.37 pursuant to *N.J.S.A.* 30:4D–17(h), which gives such certificates "the same force and effect as the entry of a docketed judgment in the Superior Court." The letter informed Sendar that he had 20 days from receipt of the letter to request a pre-hearing conference if he wished to dispute the audit and not reimburse the State. Only four days later, the defendants sent Sendar a copy of the formal Certificate of Debt, the original of which was filed with the Clerk of the Superior Court on or about January 16, 1987.

On February 5, 1987, Sendar obtained an order to show cause why the State's certificate should not be declared null and void. Sendar's complaint in lieu of prerogative writs raised three main issues: (1) it was the nursing home, Twin Oaks, Inc., not Sendar, who applied for and received Medicaid benefits, and the State had no authority to file against Sendar as an individual because it had no reason to pierce the corporate veil; (2) by filing the Certificate without notice and the opportunity for a hearing, the State had violated his rights to due process; and (3) by refusing to vacate the Certificate, the State had slandered Sendar's credit reputation.

On April 15, 1987, after a hearing on the return date of the order, the trial judge denied the requested relief and dismissed the complaint. At the hearing, however, he allowed the plaintiff to amend the complaint to add the nursing home and Marmon as parties plaintiff so that the same attack could be made upon the certificates filed against them. The judge interpreted *N.J.S.A.* 30:4D–17(h), as it applies to an interim

determination of responsibility, to mean that instead of entering a judgment against the plaintiff, only an "inchoate lien" would be placed on Sendar's ability to transfer the property. The judge further restricted the effect of the interim filing:

> If there is not a prompt hearing before an Administrative Law Judge, and if the existence of the Certificate of Debt causes hardship to any of the plaintiffs, any plaintiff may apply on motion in this action for relief from the Certificate of Debt.

Plaintiffs appealed, and on August 11, 1987 this Court remanded the case to the trial judge for clarification of his April 15, 1987 order. Upon remand, the judge reiterated his interpretation of the statute, stating:

> A true ... enforceable ... judgment ... cannot Constitutionally be obtained in the way which this statute facially seems to authorize.... The statute, if it were construed as creating a true judgment, would be unconstitutional.

He then explained that his order of April 15

> construed the statute not as creating a judgment, but instead as creating an inchoate lien.... I think I in effect reformed the statute so that it passes Constitutional muster.

The State takes no issue with the trial judge's interpretation.

From the time Twin Oaks was founded in 1972 until the initial audits, the State accepted the nursing home's cost reports detailing the expense of providing the prior year's nursing home services. The State utilized these reports to set the reimbursement rate for the ensuing year, subject to the State's right to audit the operation and seek recovery if there was an overpayment. The Division of Medical Assistance and Health Services had no problems accepting the corporation's accounting practices through and including December 31, 1984, when the nursing home was sold. The Division received copies of all pertinent documents and was informed in advance of the assignment, and has continued to deal with the successor. Under the terms of the sale, Twin Oaks Nursing Home Inc. is to receive 1.2 million dollars over the next ten years, and yet the Division issued its certificate for $646,639.37 against each of the stockholders, of which more than $200,000 is attributable to interest. The assessment was timely protested by Twin Oaks,

and if there is no settlement, Twin Oaks intends to appeal the final assessment.

There has been no claim of fraud, overreaching or any other individual or corporate misconduct in connection with receipt of payments. The differences between the parties stem from accounting issues such as appropriate basis of depreciation, classification of expenses, the propriety of borrowing funds as opposed to injecting new working capital. When plaintiffs inquired as to why certificates were filed against them individually, the Division explained that it was its customary practice to enter such judgments after the ownership of a facility is transferred. By letter to plaintiffs' counsel, defendant Bartol, the officer who signed the certificate, stated:

> In such a situation [where there are outstanding liabilities claimed by the State] where a facility has changed ownership and fiscal years prior to the date of transfer remain to be audited, this Division has routinely filed Certificates of Debt. If we are aware of a change in ownership, Certificates of Debt are sent simultaneously with the Preliminary Notice Demand and Administrative Recovery Proceedings letter. I wish to assure you that there certainly was no intent to impugn Mr. Sendar's integrity or character; the Division was merely interested in ensuring that its own substantial claim was afforded some degree of protection.

## I

First, as we have noted, the State does not contest the trial judge's limitation upon the effect of the certificate. While the statute in question, *N.J.S.A.* 30:4D–17(h), states specifically that the entry of the certificate on the Superior Court docket "shall have the same force and effect as the entry of a docketed judgment in the Superior Court," the judge determined that there can be no execution on the judgment. The effect of the "judgment" entered prior to a determination of responsibility is merely an inchoate lien subject to the final audit and the alleged debtors' right to seek redress. Plaintiffs, on the other hand, state that the statute as written provides for the docketing of the certificate which has the "same force and effect" as a judgment. They assert that since the entry was made before the plaintiffs had an opportunity to be heard, the statute is

unconstitutional on its face and is not susceptible to interpretation.

If the statute were unambiguous, plaintiffs would be correct. Words cannot be stretched to mean other than what they plainly mean. *State v. Butler*, 89 *N.J.* 220, 226 (1982); *Remedial Educ. & Diag. v. Essex Cty. Edu. Ser.*, 191 *N.J.Super.* 524, 528 (App.Div.1983), certif. den. 97 *N.J.* 601 (1984). Yet the quoted provision concerning the docketing of the certificate is part of the whole of subsection (h) of the statute, and fits within a framework of several subsections. *N.J.S.A.* 30:4D–17(f) first provides for interest penalties to be assessed, even in the case of the mistaken receipt of excess payments.

> Any person ... who, without intent to violate this act, obtains ... payments under this act in excess of the amount to which he is entitled, shall be liable to a civil penalty of payment of interest on the amount of the excess benefits or payments at the maximum legal rate in effect on the date the benefit or payment was made to said person....

Subsection (g) provides for the collection of interest and civil penalties as well as any medical assistance and other benefits to which a person was not entitled. The collection must take place in an administrative proceeding held pursuant to the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 *et seq.*[2]

Against this setting subsection (h) provides in part:

> Upon the failure of any person ... to comply within 10 days after service of any order of the director ... directing payment of any amount found to be due pursuant to [the provision providing for the administrative hearing], *or at any time prior to any final agency adjudication* ... the director may issue a certificate to the clerk of the superior court that such person ... is indebted to the State for the payment of such amount.... Such entry shall have the same force and effect as the entry of a docketed judgment in the Superior Court. Such entry, however, shall be without prejudice to the right of appeal to the Appellate Division of the Superior Court from the final order of the Director or his designee. [Emphasis added].

---

[2]We note that this section does not include a provision for the recovery of the overpayments themselves. This appears to be an oversight, since we cannot imagine that the Legislature would provide no administrative remedy for recovery of overpayments, and would limit the administrative proceedings to the recovery of only interest in the case of a good faith excess payment.

This section provides that a docketed judgment may be entered in two situations. The first is if there is a final adjudication after an administrative hearing. The second, as noted in the emphasized portion of the statute, is "at any time prior to any final agency adjudication." But a right of appeal to the Appellate Division is given, which presupposes a record that can be reviewed. Could the Legislature have intended that a filed certificate, based only upon an interim audit, would be accorded all of the attributes of a final judgment? We think not. The final sentence of the section could have no effect if execution were permitted or if any other irreversible action were taken by the State as a result of the judgment based on an interim audit. The right of a later appeal after the final order would indeed be hollow. Therefore, some lesser effect must have been intended when the certificate is filed after an interim audit.

It is not unknown in the law for an interlocutory judgment to be entered with a provision that there be no execution nor other action taken without the approval of the court, and that the judgment would be subject to modification upon application of a party if circumstances warrant such action. Such a judgment is in the nature of a lien. This is precisely the limitation placed upon the judgment by the trial judge and acceded to by the State.[3] We find no fault with this interpretation by the trial judge, since it resolves the ambiguity inherent in the statute.

## II

██ Against this setting, we must now determine whether the procedure of filing a certificate, with its limited effect prior to final adjudication, violates the due process clause of the Fourteenth Amendment of the United States Constitution.

---

[3] At oral argument before us, the State noted that its acceptance of the trial judge's interpretation was no problem, since the State's current policy was to consider the docketed judgment no more than a lien until there is a final administrative or judicial determination.

There is no question that a lien which prevents the transfer of property is a sufficient deprivation for the aggrieved party to seek the protection of the Fourteenth Amendment.

> [I]t is now well settled that a temporary, non-final deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment. [*Fuentes v. Shevin*, 407 *U.S.* 67, 85, 92 *S.Ct.* 1983, 1996, 32 *L.Ed.*2d 556, 572 (1983)].

Since the interim "judgment" is in the nature of a lien and acts as notice of the State's claim, it has many of the attributes of a *lis pendens. See N.J.S.A.* 2A:15–6 *et seq.* The constitutionality of a *lis pendens* filing was upheld in *Chrysler Corp. v. Fedders Corp.*, 670 *F.*2d 1316 (3rd Cir.1982), but only after careful analysis. The court there determined that under *Fuentes, supra,* and *North Georgia Finishing Inc. v. Di-Chem Inc.*, 419 *U.S.* 601, 95 *S.Ct.* 719, 42 *L.Ed.*2d 751 (1975), where there is an impairment of marketability, there is a sufficient degree of deprivation to require the court at least to reach the due process issue. 670 *F.*2d at 1324–1325. We, therefore, will perform a similar analysis.

In the case before us, there is no question that the filing of the certificate with its status as a docketed judgment would impair the marketability of plaintiffs' real estate, since under *N.J.S.A.* 2A:16–1, such a docketed judgment is a lien on all real estate of the judgment debtor in the State. Whether or not the additional issues raised by plaintiffs concerning the impairment of their credit have merit, this real estate ramification is sufficient for us to proceed to the due process analysis.[4]

Our due process analysis must start with *Mathews v. Eldridge*, 424 *U.S.* 319, 96 *S.Ct.* 893, 47 *L.Ed.*2d 18 (1976). The garnishment and prejudgment attachment cases such as *Fuentes, supra, Mitchell v. W.T. Grant Co.*, 416 *U.S.* 600, 94

---

[4]In *Chrysler Corp. v. Fedders Corp.*, the three elements for an attack upon a pre-hearing deprivation of rights were (1) a deprivation of property rights, (2) State action, and (3) a lack of due process. 670 *F.*2d at 1321–1327. In the case before us, since the judgment was entered by the State, we need not explore the second issue.

*S.Ct.* 1895, 40 *L.Ed.*2d 406 (1974) and *North Georgia Finishing Inc., supra,* all reflect a need to balance the interests of the respective parties. But in *Mathews,* 424 *U.S.* at 340, 96 *S.Ct.* at 905, 47 *L.Ed.*2d at 36, the Supreme Court noted that only in *Goldberg v. Kelly,* 397 *U.S.* 254, 90 *S.Ct.* 1011, 25 *L.Ed.*2d 287 (1970), a welfare termination case, has it required an evidentiary hearing before even a temporary deprivation of benefits. *Mathews* explained the requirement of balancing the individual and State interests to determine whether the individual has been accorded due process.

> More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [424 *U.S.* at 334–335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33].

We will explore these factors. Concerning the first, there is no question that the prehearing "judgment" in this case constitutes some deprivation of plaintiffs' property. Yet it is not, as in *Goldberg,* the withdrawal of the assets required for their sustenance. In *Mathews* itself, the Supreme Court held the *Goldberg* principles to be inapplicable to the termination of social security benefits, even recognizing that there are individuals whose sole income may be such benefits. The effect on private interests in this case, as the statute has been construed by the trial judge, is no more than the filing of a lien claim which potentially prevents the transfer of some assets without the satisfaction or bonding of the interest asserted by the State.[5] It in no way rises to the level banned in *Goldberg.*

---

[5]While plaintiffs have contended that their credit has been impaired, the extent of such impairment is minimal. If plaintiffs sought financing and submitted a financial statement, they would be duty bound to disclose the State's claim for reimbursement whether or not the "judgment" had been

The second consideration noted in *Mathews* is the risk of an erroneous deprivation and the probable value of additional or substitute procedural safeguards. If the State is in error, plaintiffs' credit may well be impaired and there may be a restraint on their ability to transfer real estate free of the State's lien, although the final disposition may be in their favor. At any time, however, they are free to request a hearing to determine the propriety of the State's claim or to bond the claim (with its attendant premium costs). Alternatively, there could be a requirement for a pre-filing hearing, the burden of which is a consideration for the third *Mathews* factor.

The third element described in *Mathews* is the State's interest in the matter, including the fiscal and administrative burdens that a substitute procedure would entail. Even in the non-fraud setting, it is apparent from the letter quoted earlier that the State uniformly files a certificate and obtains a judgment irrespective of any potential risk of nonpayment. The State could be required to hold hearings or otherwise substantiate its claim before it files its certificates with the Superior Court. Such a procedure, however, would create obvious administrative burdens. The statute governs all overpayments including those to recipients of Medicaid benefits. The sheer volume of such pre-filing hearings could overtax the administrative capabilities of the medical assistance program. Under the statute, the Commissioner is required to assure that within a reasonable time after their interests have been adversely affected, any alleged debtors are permitted to apply for a hearing. In this case that would be before any final determination concerning the benefits or claims payments. *N.J.S.A.* 30:4D–7e and f. The administrative burden on the State is less if it is required to respond only in those cases where the recipient claims no liability, or claims a lack of jeopardy to the State by reason of a bonding or other securing of the State's claim (even if the

---

entered. The State's claim would at least be a contingent liability to be disclosed by an honest applicant.

alleged debtors are not yet in a position to challenge the State's claim on the merits).

Balancing the factors noted in *Mathews*, we see but a slight and only potential financial burden on parties against whom the "judgments" have been entered, in that the transferability of their real estate may be impeded. We further see that the State's interests would be greatly affected if pre-judgment hearings were required to be held in all cases. Therefore, we fully subscribe to the trial judge's determination that the interim assessment can result in a lien claim not susceptible of execution. We further would impose upon the State no more than a procedure whereby a person against whom a lien has been asserted may apply for and receive an immediate administrative hearing defining the scope of the party's potential for loss and an opportunity to secure the claim and release any affected property. We were informed by the State at oral argument that such a procedure exists, but that plaintiffs have not availed themselves of it. Plaintiffs, rather, have challenged the State's right to utilize the statutory procedure.

We reject plaintiffs' argument that the certificate procedure must be subject to the same prerequisites as the securing of a writ of attachment, *N.J.S.A.* 2A:26–1 *et seq.* The State has a right to protect itself if it has made excessive Medicaid payments and seeks reimbursement. The State and federal governments may protect themselves by a lien claim procedure. *See, e.g.*, 26 *U.S.C.A.* § 6321 *et seq.* (Federal Income Taxes); and *N.J.S.A.* 30:4–80.3 (lien for charitable institutions); *N.J.S.A.* 40:48C–36 (lien for local taxes); *N.J.S.A.* 43:21–14(e) (employer's indebtedness to the State for unemployment compensation). Few if any of these statutes provide for a pre-filing hearing. (*But see N.J.S.A.* 5:2A–12 (penalty paid by public combative sports exhibitors.) While the State is accorded the benefit of these procedures, there must be a balancing of the private rights consistent with the State interests involved. We have attempted to effect such a balancing here, granting the State

its statutory protection where reimbursement might be in jeopardy.[6]

### III

The remaining issue in this case concerns the individual plaintiffs' status as shareholders of Twin Oaks Nursing Home Inc., and the State's practice of filing certificates of debt against shareholders without a showing of any of the usual prerequisites for piercing the corporate veil. *See State Dept. of Environ. Protect. v. Ventron,* 94 *N.J.* 473, 500–501 (1983) (New Jersey's "fraud or injustice" rule); *see also United States v. Pisani,* 646 *F.*2d 83, 88 (3rd Cir.1981) (Federal broader "alter ego" rule).

Absent other considerations, a corporation is considered an entity separate from its stockholders. *Lyon v. Barrett,* 89 *N.J.* 294, 300 (1982). Only after proof of "fraud, injustice, or the like" will a court pierce the corporate veil. *State, Dept. of Environ. Protect. v. Ventron,* 94 *N.J.* at 500. But as noted in *Ventron,* the common-law principles limiting a stockholder's individual liability for corporate actions may be supplemented by a statutory enactment. 94 *N.J.* at 501–502.[7]

---

[6]We do not preclude any further additional judicial or administrative proceeding which may in a particular instance be necessary to protect the individual's or State's interests. A particular asset might be permitted to be transferred free of the State's lien in a case of a debtor's great need and a questionable State claim. A court or administrative officer might determine that an asset may be transferred, with the lien to attach to the proceeds or a replacement asset, such as may be the case upon the sale of a home. Upon preliminary assessment of the State's claim it might be determined that the likelihood of the State prevailing for the full amount of its claim is such that a particular asset or a portion of encumbered assets might be transferred free of the lien. This procedure was clearly envisioned by the trial judge and we wholeheartedly endorse it.

[7]In *Ventron,* the Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.-11g(c), provided that a person "in any way responsible" for any hazardous substance is responsible for clean-up and removal costs. There the parent corporation controlled the acts of the subsidiary which allegedly caused the

In the case before us, *N.J.S.A.* 30:4D–17(h) permits the certificate to be filed against "any person [who has failed] ... to comply [with] ... any order of the director ... directing payment of any amount found to be due [in an administrative proceeding], or at any time prior to any final agency adjudication." Subsection (f) provides for interest penalties against "any person ... who, without intent to violate this act, obtains ... payments under this act in excess of the amount to which he is entitled...." The entity that had received payments here, however, was not the individuals, but the corporation, and plaintiffs contend that they cannot be held responsible for the corporate obligations.

The State, however, refers to *N.J.S.A.* 30:4D–7h granting the Commissioner, through the Division of Medical Assistance and Health Services, the power:

> h. To take all necessary action to recover any and all payments incorrectly made to ... a provider from such provider ... *or from any other person ... responsible for or receiving the benefit or possession of the incorrect payments* or their estates.... [Emphasis added].

The State argues that this section authorizes an action directly against the stockholders of the corporation. Plaintiffs contend that this section in no way relieves the State from the responsibility of proving the usual prerequisites to a piercing of the corporate veil where the provider was a corporation. The trial judge interpreted section 7h to permit the direct action against the stockholder, stating:

> [I]f it can be proven that the payments ran through the nursing home and got into Mr. Sendar's pockets and if it can be shown that Mr. Sendar had a major impact in the control of the corporation that he can eventually be made to repay.

\* \* \* \* \* \* \* \*

pollution and was encompassed within the statutory standard, yet corporate dominance is an insufficient basis to disregard the corporate form. New Jersey has not adopted the federal "alter ego" approach in this area. *See United States v. Pisani, supra,* 646 *F.*2d at 87.

I have no doubt but what that statute authorizes substantially the Director to get repayments from Mr. Sendar provided that all the substantive predicates are met. That is to to say, that it's proven that he's received payments illegally.

The problem with the trial judge's resolution of this issue is that there were allegations only of incorrect payments. The word "illegally" as used by the trial judge can be interpreted either as indicative of some fraud or deception, or merely as requiring payment in an amount in excess of that permitted by law. If the former, the corporate veil may be pierced; if the latter, it may not, applying common-law principles. The trial judge nevertheless upheld the certificates against the individuals, each in the full amount of the State's total claim.

As noted earlier, *N.J.S.A.* 30:4D–7h expands the common-law bases for proceeding against stockholders and permits recovery of payments incorrectly made to a provider from one who has received the benefit or possession of the payments. However, there has been no proceeding held to determine whether the individual plaintiffs received such benefit or possession. If, as stockholders in the corporation, they had sold their shares to others and received a purchase price enhanced by the value of the alleged excess payments, then it might be said that they had received the benefit of the payments alleged to have been incorrectly made. In this case, however, the corporation sold its assets to a successor, and the corporation has the right to receive payments over the next ten years in amounts totalling approximately double the State's claim.

There was no showing that plaintiffs have received any benefit or possession of the State's payments. Although the common-law standard is supplemented by the factors noted in *N.J.S.A.* 30:4D–17h, *cf. State Dept. of Environ. Protect. v. Ventron Corp., supra,* 94 *N.J.* at 501–502, the Commissioner is empowered only "[t]o take all necessary action" against an individual who satisfies the statutorily supplemented standard.

The State cannot substitute a standard of "stockholder," a standard acknowledged by the State in its letter of January 16, 1987 to be the sole basis for its routine filing of certificates of debt where there has been a transfer of the provider's assets. The trial court therefore should have held a hearing to determine whether there may be shareholder responsibility in this case.

█ Another issue is apparent and also was raised in the Law Division. The certificates filed against each stockholder were each for the total amount of the debt. The recovery envisioned in *N.J.S.A.* 30:4D–7 was "any and all payments incorrectly made to ... a provider." The recovery could be accomplished from the provider or from one "receiving the benefit or possession of the incorrect ... payments." There is no statement that all recipients are jointly and severally liable. If a hypothetical nursing home corporation is publicly held with 10,000 stockholders, sells its business, including $600,000 of allegedly mistaken overpayments, for $2,000,000, and thereafter distributed $200 to each of its stockholders, it would be grossly unfair for the State to encumber the assets of each stockholder with a $600,000 certificate of debt. The court should therefore determine on remand here what amount each of the stockholders might be responsible for at this time, and the certificate should be so limited. The court could further order that any additional payments from the corporation be escrowed or else supplemental certificates might be filed; all of this presupposing, but not determining, that there actually might be a finding of responsibility.

It may also be that either or both of the stockholders was separately liable for the alleged overpayments as a person "responsible for" the payments under *N.J.S.A.* 30:4D–7h. Either or both may have certified that the payments were correct or that the accounting methods were proper. If this is so, they

may be liable, not as stockholders after a piercing of the corporate veil (applying the supplemental statutory standard), but vicariously, for the action of the corporation. The statute recognizes such an additional basis by the addition of the words "responsible for." This theory of liability may similarly be explored by the trial judge on remand.

We lastly note that this matter was instituted alleging a claim for a civil rights violation under 42 *U.S.C.A.* § 1983. We cannot determine on this record whether the individuals have been subjected to any improper State action denying them due process and depriving them of any property right. On remand, if the individual plaintiffs are absolved from responsibility, the trial judge should determine this issue as well. Although we have found the certificate procedure to be constitutional, it may be subject to challenge as applied to the individuals.

In sum, we sustain the certificate of indebtedness procedure as a valid method for the State to recover incorrect as well as illegal Medicaid payments to a provider. We further sustain the trial court's determination of the effect of the certificates filed as a result of interim audits as lien claims. We reverse and remand the determination that the individual plaintiffs as shareholders of the provider are *ipso facto* responsible jointly and severally for such overpayments, and direct that a hearing be held as to whether they are liable at all, either as recipients of the funds or as those responsible for the payments, and if so, in what amounts. Finally, if the State action is found by the trial judge to have deprived the individual plaintiffs of any property rights without due process of law, the trial court may consider plaintiffs' pending claims under 42 *U.S.C.A.* § 1983.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.